573 So.2d 657 (1990)
Kevin Lewis TURNER
v.
STATE of Mississippi.
No. 03-DP-0082.
Supreme Court of Mississippi.
December 12, 1990.
*661 T. Patrick Welch, John P. Price, McComb, Clive A. Stafford Smith, Atlanta, Ga., for appellant.
Mike C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Jackson, Dunn O. Lampton, Dist. Atty., Magnolia, for appellee.
En Banc.

ON PETITION FOR REHEARING

PART ONE: GUILT PHASE
ROY NOBLE LEE, Chief Justice, for the Court:
Kevin Lewis Turner was indicted in the Circuit Court of Pike County, Mississippi, for the capital robbery/murder of Elizabeth Blakely, and, as an habitual criminal. Venue was changed to Hinds County where the trial began on May 26, 1987. Turner was found guilty of capital murder on May 28, 1987, and in a bifurcated trial, the jury imposed the death penalty upon Turner the next day. Thereafter, the trial judge conducted a hearing on the habitual criminal charge and Turner was adjudged to be an habitual offender. Turner has appealed to this Court and assigns twenty-two (22) errors in the trial below.

I. FACTUAL BACKGROUND
The facts of this case are undisputed. On December 2, 1985, appellant Kevin Turner and Eric Jones went to the "Forget Me Not" grocery in Summit, Mississippi, for the purpose of burglarizing it. When they arrived at the store, they found the front door to be unlocked. They opened the door and entered the store. Elizabeth Blakely, the owner and only occupant, came from the back to wait on them. Jones asked for change to use the cigarette machine and Ms. Blakely went to the rear of the store to make the change. Upon her return to the front, Kevin Turner pulled a .38 revolver, pointed it at her and said that it was a stickup. Immediately, Turner shot the victim and moments thereafter shot her two more times. Two of the wounds were fatal, one being to the brain and another through the heart. The third was a flesh wound. After shooting Ms. Blakely, Turner and Jones searched and ransacked the building looking for valuables. Approximately $190.00 in cash was found and taken by Turner. They took the victim's car keys, house keys and purse, and went next door to her home which they searched for things of value. After leaving the premises in disarray, they returned to the store, wrapped the victim's body in a blanket and put it in the trunk of her car.
Turner and Jones then went to the house where Jones lived, changed clothes, and told Jones' mother that they were going to New Orleans. Turner went back to the store, got the victim's car, and picked up Jones around the corner. They drove around for a while and then decided to drive to Memphis and dump the victim's body. When they arrived in Memphis, they decided to drive on to Chicago.
Appellant Turner lived in his mother's house in Chicago and had gone to the Summit, Mississippi, community for a visit. When Turner and Jones arrived in Chicago, they went to the home of appellant's mother and stayed there. During their stay, they committed crimes, including robberies, in Chicago. In the meantime, family members, being concerned about the disappearance of Ms. Blakely, began to make inquiries and notified law enforcement officials. They entered the victim's home and store, where they discovered the evidence of foul play. The investigation indicated Turner and Jones were suspects, the Chicago Police Department was contacted, and the license plate number of Ms. Blakely's car was given the Chicago police along with the address of appellant's mother.
The Chicago police went to the Turner home, where they found Kevin Turner and Eric Jones and arrested them. They opened the trunk of the victim's car and found her body. This occurred on December 8, 1985, seven (7) days after the robbery/murder.

II. IN THE FACE OF UNREBUTTED EVIDENCE OF DISCRIMINATION IN JURY SELECTION, THE LOWER COURT OUGHT TO HAVE GRANTED A MISTRIAL
The jury, which heard this case, comprised eight (8) blacks and four (4) *662 whites with one (1) white alternate and one (1) black alternate. The State exercised six (6) peremptory challenges to excuse blacks and two (2) to excuse whites. The appellant exercised twelve (12) peremptory challenges, all against whites. The appellant complains that there was discrimination in the selection of the jury. As soon as the jury selection process began, the appellant raised the Batson[1] issue and the trial judge, without further discussion, instructed the prosecutor that the State would be required to give race neutral reasons as to the peremptory challenge of any black person. The reasons stated by the prosecutor appear follow:
(1) The first peremptory strike used by the State was against a prospective juror by the name of Brenda Bell, who is a black female. The prosecutor told the court that he had initially challenged her for cause because she said, "In my mind I couldn't vote for the death penalty." The prosecutor felt that she had conscientious scruples against the death penalty and that she could not be fair in her decision. The trial judge agreed with the prosecutor and stated that it was a non-discriminatory exercise of peremptory challenge and he allowed it.
(2) The second challenge was against a woman by the name of Juanita Bennett. The record is not clear as to whether or not she was black or white, but it appears that she was a black female. In any event, the prosecutor objected to her for the same reasons as the previous juror because she stood up during voir dire and stated she was against the death penalty. The trial judge found that this was also a non-discriminatory exercise of a peremptory challenge and he allowed it.
(3) The third challenge used by the State was against David Bradley, white male. The State excused him for the same reason as the two previous jurors  that he was opposed to the death penalty. The court then tendered those to the defense, and the defense used five (5) of its challenges, all against white members of the jury.
(4) The fourth challenge used by the State was against Julia D. Brown. The State gave the reason that she also stood up in voir dire and expressed opposition to the death penalty. The trial judge accepted that as being non-discriminatory and allowed the strike.
(5) The prosecutor next struck a white female by the name of Susan L. Brumfield because she was opposed to the death penalty.
(6) The sixth challenge was to a black female by the name of Valerie Butler. The prosecutor said that she had stated on voir dire that she did not think that this case was as important as some other cases which have occurred in Hinds County. The prosecutor stated that she also attempted to walk out of the courtroom and that several times she stood up and walked around during voir dire and got coffee. The court also noticed that she had stated that she had heard about this case through relatives. The trial judge allowed the challenge as being non-discriminatory.
(7) The seventh challenge used by the prosecutor was against a black male by the name of Roy L. Davidson. The prosecutor's reason for striking this man was that he was currently charged with a crime, that he had said he was the head of a household and needed to be home with his kids, and that he was a teacher, currently in the middle of giving exams. This juror also had asked to be excused from service. The trial judge allowed the peremptory strike as being non-discriminatory based on the fact that the man was charged with a crime.
(8) The eighth juror stricken by the State was a black female by the name of Beulah M. Dillon. The State's reasoning was that she also tried to leave the courtroom, did not listen to the prosecutor during voir dire, that she requested to be excused, and her employer had written a letter for her, asking for her to be excused. The prosecutor reasoned that because she had prepared a letter asking to be excused from service, her attention to the case would be distracted. The trial court agreed with the prosecutor *663 and allowed the challenge as being non-discriminatory.
(9) The prosecutor next attempted to challenge a black female by the name of Brenda Dotson. His reason was that she is a Catholic and had taken a position against the death penalty. The prosecutor stated that his main reason was the fact that she did not respond to the questions that he asked. The trial judge did not allow this strike, and the juror ultimately was seated on the jury.
(10) The State attempted to strike a black male by the name of S.L. Edwards. The prosecutor stated that Edwards had been unresponsive to his questions and had not answered a single one and that he was uncomfortable with seating the man on the jury. The trial court did not permit the exercise of this challenge, and this man was seated on the jury.
The trial court then moved into the selection of the alternate jurors and allowed each side two strikes per alternate. The prosecutor attempted to strike a Mr. Tony Fields, Jr., as being unresponsive to any of his questions and that he had read about capital murders in the paper. The trial court did not allow this strike and seated Mr. Fields on the jury. Mr. Fields is a black male.
(11) The last strike used by the State was against a Mr. Charles Fulgham. The State's reason was that Mr. Fulgham had told them he had health problems and had conscientious scruples against the death penalty and that he wouldn't keep an open mind and would not listen to the evidence. The court agreed and found that this was a non-discriminatory use of the peremptory challenge and allowed such by the State.
As to the appellant's contention that opposition to the death penalty is some form of discrimination, the issue has already been addressed in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), where the U.S. Supreme Court ruled that opposition to the death penalty is not in the same suspect classification as race.
The reasons given by the prosecutor for striking the jurors, in our opinion, easily passed the requirements set forth in Lockett v. State, 517 So.2d 1317 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988), and Batson, supra.
The assignment of error is rejected.

III. THE INSTRUCTIONS AT THE GUILT PHASE ERRONEOUSLY STATED THE LAW
The appellant contends that the lower court erred in declining to grant him a manslaughter instruction. He claims lack of self-control and argues that he may have thought the victim had a gun and, therefore, the manslaughter instruction was justified. The argument is badly flawed and is completely without factual basis. At the conclusion of the State's case on the guilt phase, the appellant rested without introducing any evidence. There was no evidence to raise a question of manslaughter, and the lower court correctly refused the manslaughter instruction. Fairchild v. State, 459 So.2d 793 (Miss. 1984) and Gray v. State, 472 So.2d 409, 417 (Miss. 1985).

IV. REFERENCE TO THE CO-DEFENDANT'S CONFESSION VIOLATED APPELLANT'S RIGHT TO CONFRONTATION
Officer Charles Fitzgerald testified for the State. The appellant contends that the following questions and answers violated his right to confrontation of a witness:
Q. Did you also take a statement, I believe you said, from Eric Jones?
A. I did.
Q. Is Eric Jones or was Eric Jones' statement consistent?
A. Yes, it was. With Kevin Turner's. Yes, it was.
No objection was made to the questions and the point is procedurally barred. Failure to object may have been trial strategy. Eric Jones, the accomplice, was called by the State and he testified about the robbery/murder. The appellant thoroughly cross-examined Eric Jones and even handed Jones a copy of his statement to the officers and required him to read portions of it during the cross-examination. There is no *664 violation of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) or Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1967).
The assignment is rejected.

V. APPELLANT'S CONFESSION SHOULD HAVE BEEN SUPPRESSED IN VIEW OF THE BEATINGS AND THREATS ADMINISTERED BY THE CHICAGO POLICE DEPARTMENT
The appellant bases much of his argument here on the claim that the Chicago Police Department has a bad reputation for abusing and coercing prisoners. However, in the suppression hearing, the State called as witnesses Detectives John Paladino, Anthony Manslacka, Patrick Mokry, Thomas Kripple, William Egan, Michael Bosco, and Thomas Shine of the Chicago Police Department and Assistant State's Attorney Charles Fitzgerald of the Cook County District Attorney's Office. These were all officers and persons having any contact with appellant in connection with statements given by him. Only one officer, Detective Bill Pederson, was absent and his absence was explained  his wife was undergoing breast cancer surgery and his presence was required with her in Chicago. We are of the opinion that the requirements of Agee v. State, 185 So.2d 671 (Miss. 1966), were fully complied with.
All of the above-mentioned officers testified fully and completely that the confessions given by appellant were free and voluntary after he had been properly advised of his Miranda rights.[2] After hearing all the evidence, the lower court held that the confession of appellant was free and voluntary beyond reasonable doubt. The law is well settled that the trial judge is a fact-finder and that his finding will not be reversed unless manifestly wrong. Frost v. State, 483 So.2d 1345 (Miss. 1986); Lockett v. State, 517 So.2d 1317, 1328 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988).
The assignment is rejected.

VI. THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION COMPELS THE CONCLUSION THAT THE ILLEGALLY-SEIZED PHYSICAL EVIDENCE AND APPELLANT'S SUBSEQUENT STATEMENTS SHOULD HAVE BEEN SUPPRESSED
Appellant came from Chicago to Mississippi and visited in the trailer home of his cousin, Bruce Hampton, Route 4, Box 250, Summit, Mississippi. After appellant was developed to be a suspect in the case, police officers went to Hampton's trailer and obtained permission from him to search it. Inside, the officers found evidence which linked appellant to several burglaries. Particularly found were a gold telephone, five mirrors, a cassette player, a bag with Ray Graphics on it and some cassette tapes which had been taken in a burglary/arson of Doyle Roy's trailer. The mirrors were recovered from Hampton's bedroom, the telephone from the den of the trailer, the cassette player from Hampton's bedroom, the Ray Graphics bag from between the mattresses in the bedroom that appellant used and the cassette tapes from the top of the dresser in the bedroom that appellant used. Hampton testified that appellant brought all the items into his trailer and presented some of them to him as gifts; that he and appellant had a disagreement and appellant left the house and had not been back.
The lower court held that Hampton freely gave permission for the officers to search the trailer; that there was no reasonable expectation of privacy in that appellant did not have exclusive possession or control of the premises; that appellant was a guest in Hampton's house and not a tenant; and that appellant paid no rent and there was no agreement that he worked for Hampton in exchange for rent. Hampton verbally gave consent for the search of the trailer and subsequently executed a written consent. In Rakus v. Illinois, 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978), it was held:

*665 A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.
See also Depreo v. State, 407 So.2d 102 (Miss. 1981).
We are of the opinion that the search was legal and that there was no Fourth Amendment violation of appellant's rights.
Hampton advised the police that he had talked with appellant's mother in Chicago and she thanked him for helping pay for Kevin's car. She described the car to Hampton and gave him the license plate number, which he in turn gave to the police along with the address of appellant's mother in Chicago. The Pike County Sheriff's Department sent the information to the Chicago Police Department along with warrants for the arrest of Turner and Jones on charges of burglary, larceny and arson.
The Chicago police went to the Turner home where they arrested Jones and appellant. The latter was found hiding in the attic. He was given his Miranda rights and advised the officers that he wished to cooperate. Appellant told that he had hidden the murder weapon upstairs in the bedroom. The officers obtained a consent to search form from their vehicle, read it to the appellant, and the appellant read it and signed it. The murder weapon was recovered from the bedroom and Ms. Blakely's body was recovered from the trunk of her car, which was parked in front of the Turner house.
The trial judge heard all the evidence and made a finding that the search and arrest were lawfully made, and that there was no violation of appellant's constitutional rights. Therefore, we are bound to accept the finding as correct and proper.
The assignment is rejected.

VII. AN INDICTMENT OBTAINED FROM A BIASED GRAND JURY CANNOT BE PREDICATE FOR A DEATH SENTENCE
The appellant bases his complaint on this issue that members of the grand jury were familiar with the facts of the case and could not be fair in their determination of whether there was probable cause for a true bill of indictment. Lawyers and judges who have been exposed to and have had experience with the criminal process in the trial courts are aware that some members of grand and petit juries have knowledge that a crime has occurred but are not informed of the facts of the case to the extent that they could not sit as a juror. In the case sub judice, there is no evidence in the record that would disqualify any member of the grand jury from hearing the presentation and participating in the action of the grand jury. To the contrary, the record reflects that they were qualified and that no prejudice resulted to the appellant.
The appellant did not move the court to quash the indictment because of prejudice as a result of this assigned error. The point is improperly raised here for the first time and is procedurally barred. Johnson v. State, 404 So.2d 533, 556 (Miss. 1981).
The assignment is rejected.

VIII. THE INDICTMENT AGAINST APPELLANT WAS OBTAINED BY A PROCESS OF RACIAL DISCRIMINATION AND SHOULD BE QUASHED
The complaint here is practically identical with the immediately preceding argument. Appellant emphasizes that he was discriminated against because the foreman of the grand jury was not black.[3] In Johnson v. State, 404 So.2d 553 (Miss. 1981), this Court addressed a similar claim and distinguished Rose v. Mitchell, from the Mississippi procedure. The Court said:

*666 Under Mississippi procedure, the grand jury foreman is appointed by the trial judge after the grand jurors are selected in a random procedure as required in Mississippi Code Annotated section 13-5-26 (Supp. 1981). The foreman is administered a statutory oath, and the other grand jurors are administered an oath that they will be bound by the same oath taken by the foreman. Miss. Code Ann. § 13-5-45 (1972). The foreman has the authority to order subpoenas for all witnesses, swear the witnesses, and he keeps a record of the witnesses sworn for the court. Miss. Code Ann. § 13-5-63 (1972). Except for this authority, the foreman has no greater responsibility in the returning of indictments than any other grand juror; and, the grand jury serves for a very limited period of time. As a matter of common practice, any member of the grand jury may request the issuance of subpoenas and may call for any information or investigation authorized by law. Unlike the Tennessee statute, a grand jury foreman in Mississippi has no more discretionary responsibilities or duties than any other member of the grand jury.
In this case a grand jury adequately representing the population of Panola County, which is 49 percent black and 50.8 percent white with .2 percent representing other minorities, indicted the appellant, and a petit jury, also adequately comprised with respect to the races of Lafayette County, convicted appellant of capital murder. Consequently, under these undisputed facts, no theory could be reasonably justified upon which to predicate a holding that this individual defendant has suffered any prejudice.
Johnson, 404 So.2d at 556.
The grand jury here consisted of eleven (11) blacks and nine (9) whites, which indicates that there were blacks on the grand jury in excess of the representation on the voting rolls. Again, there was no showing of prejudice.
The assignment is rejected.

IX. THE CARTE BLANCHE EXCLUSION AND EXEMPTION OF CERTAIN JURORS VIOLATED APPELLANT'S RIGHTS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
The contention here is that appellant's constitutional rights were violated because Mississippi exempts illiterates and those under twenty-one (21) years and over sixty-five (65) years of age. The questions have been previously addressed by this Court and have been held to be constitutional.
The issue of the 21-year-old exclusion has been decided and held not to violate the constitution. Irving v. State, 498 So.2d 305, 319 (Miss. 1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); Fermo v. State, 370 So.2d 930 (Miss. 1979); Joyce v. State, 327 So.2d 255 (Miss. 1976); Johnson v. State, 260 So.2d 436 (Miss. 1972).
The literacy question was addressed and found to be without merit in Terrell v. State, 262 So.2d 179, 180 (Miss. 1972). The fact that a juror, who cannot read or write, actually sits on a jury is not error that would entitle the defendant to a new trial. Huggins v. State, 103 Miss. 227, 60 So. 209 (1913).
The exemption granted to persons sixty-five and older is a personal exemption which must be claimed by that individual. No one is excluded from the jury just because he/she is over sixty-five years of age and there is no unconstitutionality in the exemption. It is similar to the exclusion of practicing lawyers and physicians. Miss. Code Ann. § 13-5-23 (Supp. 1987).
The assignment is rejected.

X. THE EXCLUSION OF A JUROR WHO AGREED TO FOLLOW THE LAW VIOLATED APPELLANT'S CONSTITUTIONAL RIGHTS
The prospective juror Joyce Black stated her views against the death penalty in the following question from the court:
Q. All right. Do you feel that your views against the death penalty would *667 prevent the making of an impartial decision?
A. As far as the sentencing?
BY THE COURT: Yes.
BY THE PROSPECTIVE JUROR: Yes, sir.
The juror's answer indicated that she could not give an impartial decision with reference to the death penalty and the challenge for cause by the State was sustained. Lockett v. State, 517 So.2d 1317 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). See also Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); Wiley v. State, 484 So.2d 339 (Miss. 1986), cert. denied, 479 U.S. 906, 107 S.Ct. 304, 93 L.Ed.2d 278 (1986); Fuselier v. State, 468 So.2d 45 (Miss. 1985).
The assignment is rejected.

XI. THE PREJUDICIAL AND INFLAMMATORY PHOTOGRAPHS IN THIS CASE SHOULD NOT HAVE BEEN ADMITTED
Photographs of the victim's body were introduced in evidence. The body was fully clothed, there was no large amount of blood and the body was not decomposed, although it had been in the trunk of her automobile for seven (7) days. The photographs were used by the forensic pathologist to point out wounds and the effects of those wounds and they had probative value. They were not gruesome or prejudicial other than depicting the corpse of the victim. The trial judge did not abuse his discretion in admitting them in evidence. Williams v. State, 544 So.2d 782, 785 (Miss. 1987).[4]
The assignment is rejected.
CONVICTION AFFIRMED.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and BLASS, JJ., concur.
ANDERSON, J., not participating.

PART TWO: SENTENCING PHASE

XII. THE EXCLUSION OF EVIDENCE IN MITIGATION VIOLATED THIS COURT'S RULING IN JORDAN V. STATE, 518 SO.2D 1186 (MISS. 1987)
During the sentencing phase of the trial, appellant wanted to call members of his family to testify as to the impact of a death sentence on them, and he attempted to have the family of Edward Earl Johnson testify as to the impact of Johnson's death sentence and execution on them.[5] Further, Clive Stafford Smith, attorney of record here, was called as a witness and he gave a proffer of his testimony about events surrounding the execution of Edward Earl Johnson, whom he represented on appeal. The trial judge excluded all such testimony. Appellant contends that the lower court committed prejudicial error.
The court had the same issue before it in Mease v. State, 539 So.2d 1324 (Miss. 1989), and held that the assigned error had no merit. Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), supports the ruling of the trial judge. Such testimony simply is not relevant to the consideration of whether the death sentence should be imposed. See also Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); and Smith v. Commonwealth, 734 S.W.2d 437 (Ky. 1987), cert. denied, 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 778 (1988).
The assignment is rejected.

XIII. THE INSTRUCTIONS AT THE PENALTY PHASE FAILED ADEQUATELY TO CHANNEL THE JURY'S DISCRETION IN THE CONSIDERATION OF MITIGATING CIRCUMSTANCES
Appellant contends that the wording of the sentencing instruction improperly *668 shifts the burden of proof to the appellant to show that death was an inappropriate punishment.
The instructions complained of by the appellant have passed the scrutiny of this Court and the federal courts. In Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982), cert. denied, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983), the Fifth Circuit said that the Mississippi Supreme Court has construed its capital punishment statute to place the burden of proving any aggravating circumstances on the prosecution; that Mississippi prevents a jury from imposing the death penalty, if the mitigating factors outweigh the aggravating factors; and that, therefore, it stands to reason that the jury must find that the aggravating circumstances outweigh the mitigating circumstances in order to impose a death penalty.
In Lockett v. State, 517 So.2d at 1338, the jury was instructed that it should weigh the mitigating circumstances against the aggravating circumstances and, if the former outweighed the latter, then it should return a sentence of life imprisonment. This Court found that wording to be proper. The instruction in the case sub judice does nothing more than state the same thing as the instruction in Lockett. See also Jordan v. State, 365 So.2d 1198 (Miss. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979).
Appellant cites Jackson v. Dugger, 837 F.2d 1469 (11th Cir.1988), wherein the Court vacated a death sentence because of an instruction given by the lower court stating that death is presumed to be the proper sentence unless it or they are overridden by one or more of the mitigating circumstances provided. That case is distinguished from the case sub judice where the jury was never told or informed in any manner that the death penalty was presumed to be appropriate in this case. It is clear from the instructions given to the jury here that the State bore the burden of proof all the way through the trial.
Appellant also argues that the jury was improperly instructed on mitigating circumstances; that there was an inference given to the jury that it must find the mitigating circumstances unanimously. Appellant cites Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), where the trial court instructed the jury that it must find the mitigating circumstances by a unanimous jury. Such is not the case here. Appellant further claims that the language of the instruction at page 199 of the record is improper. That portion of the instruction follows:
(4) Any other matter, or any other aspect of the defendant's character or record and any other circumstance of the offense brought to you during the trial of this cause which you, the jury, deem to be mitigating on behalf of the defendant.
We do not agree with that conclusion of the appellant. The following instructions were also given by the court in the present case:
Instruction II-16D
The Court instructs the Jury that a mitigating circumstance does not have to be proven beyond a reasonable doubt to exist. You must find that a mitigating circumstance exists if there is any substantial evidence to support it.
Instruction II-17D
Regardless of the balance of aggravating and mitigating circumstances, you may afford Kevin Turner mercy in this proceeding.
Instruction II-18D
The Court instructs the Jury that you need not find any mitigating circumstances in order to return a sentence of life imprisonment.
Instruction II-19D
The verdict of the jury must represent the considered judgment of each juror. It is your duty as jurors to consult with one another and to deliberate in view of reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide the case *669 for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning the verdict.
We are of the opinion that the instructions, all offered by the appellant and granted by the court, make it clear to the jury that it did not have to be unanimous in finding a mitigating circumstance before it could consider same. In closing arguments by the appellant's counsel, the jury was repeatedly informed by both defense counsel that it only took one of them to return a life sentence and that it only took one of them to find mercy.
We have carefully considered all the instructions and are of the opinion that, when considered together, the jury was properly informed of its duty and that the lower court was not in error in granting the instructions.
The assignment is rejected.

XIV. THE INSTRUCTIONS AT THE PENALTY PHASE FAILED ADEQUATELY TO CHANNEL THE JURY'S DISCRETION

A. "Heinous, Atrocious or Cruel" Instruction
Appellant contends that the instructions on aggravating circumstances were inadequate to channel the jury's discretion. He cites Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), attacking the granting of the instruction on "heinous, atrocious and cruel" grounds. The jury found this aggravating circumstance and two others  that the defendant had been previously convicted of another capital offense or of a felony involving the use or threat of violence to the person and, that the capital murder was committed for pecuniary gain. A limiting instruction was granted as to "especially heinous, atrocious or cruel" which follows:
The Court instructs the Jury that in considering whether the capital offense was especially heinous, atrocious or cruel, heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.
The United States Supreme Court recently held that a limiting instruction  similar to the one quoted above  was "not constitutionally sufficient." See Shell v. Mississippi, ___ U.S. ___, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990). Therefore, in the case sub judice, the trial judge on remand must heed Shell's dictate and not give the same instruction.

B. Instructions S-2 and S-4
The appellant next complains about sentencing Instructions S-2 and S-4. The Instruction S-2 reads:
The Court instructs the Jury that at this phase of the trial conducted for the purpose of determining the sentence to be imposed upon the defendant, the State and the defendant may elect to stand on the testimony of [sic] the evidence introduced during the first or guilt phase of this trial, or the parties may elect to introduce additional testimony into evidence as to matters that the Court deems relevant to sentence, including matters relating to any of the aggravating or mitigating circumstances. In reaching your verdict, you may consider the testimony and the evidence presented during the first phase of the trial together with the testimony and the evidence, if any, relating to any of the aggravating or mitigating circumstances presented for your consideration during the second or sentencing phase of the trial.
[Emphasis added].
The jury was told that it could only consider the evidence introduced in the first phase of the trial if it related to aggravating or mitigating circumstances. Instruction S-4 made no mention of the consideration *670 of evidence from the first phase of the trial. The two instructions were proper.
The assignment is rejected.

XV. THE PROSECUTOR ERRONEOUSLY COMMENTED ON APPELLANT'S ASSERTION OF HIS FIFTH AMENDMENT PRIVILEGE IN VIOLATION OF MISSISSIPPI CODE ANNOTATED § 13-1-9
The appellant did not testify during the guilt phase of the trial but did testify during the sentencing phase. In closing argument at the sentencing phase, the prosecutor stated:
In a lot of cases you wonder whether or not the defendant is actually guilty. We've had the benefit in this trial  it was somewhat unusual for a defendant to take the stand. And you realize that he didn't take the stand until this stage.
BY MR. WELCH: I'll object, Your Honor, and move for a mistrial.
BY THE COURT: Overruled.
BY THE COURT: Overruled.
BY MR. LAMPTON: And he admitted to you that he was guilty of capital murder, that he killed her, that he shot her, that Eric Jones didn't. So that's nothing for you to worry about. You know now beyond a reasonable doubt, by beyond any doubt, beyond the shadow of a doubt, beyond any doubt, that he is the one that actually killed Elizabeth Blakely.
The appellant now contends that this comment by the prosecutor was a violation of his constitutional rights and Mississippi Code Annotated § 13-1-9 (1972). West v. State, 485 So.2d 681 (Miss. 1985), cert. denied, 479 U.S. 983, 107 S.Ct. 570, 93 L.Ed.2d 574 (1986), and other cases cited by the appellant are not on point as they all relate to comments made during the guilt phase of trials. Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). On retrial this comment should not be repeated.

XVI. THE ADMISSION OVER OBJECTION OF INVOLUNTARY UNCONSTITUTIONAL PRIOR CONVICTIONS VIOLATED APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
Appellant contends that (1) the armed robbery convictions committed by appellant after the robbery/murder were entered as aggravating circumstances against the appellant and that (2) the prior armed robbery convictions were unconstitutional and improperly before the jury. In Reddix v. State, 381 So.2d 999 (Miss. 1980), cert. denied, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980), this Court held that prior convictions entered after the crime in question was committed were admissible as aggravating circumstances against the accused. See also Jones v. State, 381 So.2d 983, 994 (Miss. 1980), cert. denied, 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (1980).
As to the second point, it was addressed and disposed of in Nixon v. State, 533 So.2d 1078 (Miss. 1988).
Appellant cites Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), and argues that it is controlling in the case at bar. That is not so. Johnson was before the Court in a post-conviction relief posture and produced an order of the New York Court of Appeals vacating his prior conviction. Here, there is no order from any state where Turner was convicted vacating any convictions on his part. The trial judge's ruling follows:
BY THE COURT: Well, I do not know whether any conflict existed between the codefendant, Eric Jones, and the defendant, Kevin Turner, in Illinois as to those event [sic] that took place in Illinois. But, apparently, the charges there in Illinois resulted in a conviction or a plea of guilty, and it's my understanding there is no appeal that has been taken from those adjudications of guilt and sentences in the State of Illinois, and no suit has been filed in an attempt to collaterally attack those convictions and adjudications of guilt and sentences in the State of Illinois. *671 And for that reason, they will be admitted into evidence... .
The assignment is rejected.

XVII. THE INFLAMMATORY CROSS-EXAMINATION OF APPELLANT INJECTED AN ARBITRARY ELEMENT INTO THE SENTENCE OF DEATH
The appellant complains that on cross-examination (by the district attorney) during the sentencing phase, (1) the subject of religion was improperly injected into the cross-examination, and (2) the district attorney attempted to get appellant to demonstrate how he killed the victim, thus, inflaming the jury. The district attorney asked, "Did the thought of her having a Christian burial ever cross your mind?" The lower court overruled an objection to that question. During the State's closing argument, the prosecutor made the following comments:
What did he do with the body in the trunk? Was he still scared? I asked him about the Christian burial. I asked him did he think about her family, the fact that her  he said, "No, I was too scared to think about that." He was not too scared to commit at least three or, as he says, three or four armed robberies. Those people were not shot and killed because they couldn't identify him at that time. They didn't know him. They couldn't call Lester Jones and say, "Lester Jones, that red boy's been in here and he's armed robbed me, and go get him." That's why they were not injured, I submit to you.
The case of Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), cited by appellant, condemned the Christian burial speech by the police. The police had Brewer in custody and were transporting him to jail. It was Christmas time and they talked of the burial of the victim, who was a child. They were able to extract from the suspect the place where the body was buried and hence a confession. Brewer is no authority for the position taken by the appellant here. Further, attorneys for appellant made numerous references to scriptures in the Bible and quoted them to the jury in an attempt to obtain mercy for appellant.
On cross-examination, the district attorney asked the appellant to take the murder weapon, stick it in his pants, then pull it out, aim it and pull the trigger. He was having the appellant demonstrate the time it took appellant to go through those motions. This was in response to the contention of appellant that he shot the victim on a sudden impulse. This Court and the federal courts have held that defendants may be required to perform physical acts before the jury such as standing, assuming a stance, walking, or making particular gestures. See Coats v. State, 253 Ala. 290, 45 So.2d 35 (1950); Ivey v. State, 369 So.2d 1276 (Ala. 1979); Gustafson v. State, 267 Ark. 278, 590 S.W.2d 853 (1979).
The assignment is rejected.

XVIII. THE INTRODUCTION OF EVIDENCE OF THE VICTIM'S WORTH OFFENDS THE CONSTITUTIONAL PRINCIPLES ELABORATED IN BOOTH AND FUSELIER

The appellant contends that statements of the prosecuting attorney amounted to victim impact or worth statements and cites Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) and Fuselier v. State, 468 So.2d 45, 53 (Miss. 1985), in support of his contention. Those cases are distinguished from the case sub judice. Fuselier involves members of the victim's family being allowed to sit inside the rail of the court behind the prosecution table, advising with the prosecutor, not with victim impact or worthy testimony. In Booth, the State was allowed to introduce over objection lengthy victim impact statements which described the personal characteristics of the victims and the emotional impact of the crimes on the victim's family and set forth the family members' opinions and characterizations of the crimes and of the defendant. Such is not the case here.
The prosecutor simply said that Ms. Blakely was a wonderful old lady, who had *672 committed herself to years of hard work and that she was an institution. He then argued concerning Ms. Blakely's personal right to live and to operate her store and said:
I'm sure that when she chose the name of her grocery store, she never thought that a district attorney would stand up in court and repeat that name. Forget Me Not. Let's don't forget her. Because without her death, we wouldn't be here. Without the defendant's actions, we would not be here.
The record reflects that no objection was made to any of the statements or matters now the subject of appellant's complaint. Without a contemporaneous objection, the claim is waived. Lockett v. State, 517 So.2d 1346 (Miss. 1987); Lockett v. State, 517 So.2d 1317 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); Booker v. State, 511 So.2d 1329, 1331 (Miss. 1987), cert. denied, 485 U.S. 982, 108 S.Ct. 1281, 99 L.Ed.2d 492 (1988); Booker v. State, 449 So.2d 209 (Miss. 1984); Hill v. State, 432 So.2d 427 (Miss. 1983).
The assignment is rejected.

XIX. THE PROSECUTOR'S EXAMINATION OF THE PRIMARY DEFENSE WITNESS AT THE PENALTY PHASE ON LEGAL DEFINITIONS DEPRIVED APPELLANT OF HIS RIGHT TO A FAIR TRIAL
On cross-examination, the prosecutor asked the defense psychologist the following questions:
Q. Do you have any conscientious scruples against the death penalty?
A. No, sir. If  if you would like me to elaborate, I would say that I have some reservations about the death penalty which basically have to do with how it is applied and under what circumstances, but I've been a clinician and been around enough people long enough to know that I would not question the death penalty being applied appropriately in some circumstances.
Q. And what determines the appropriateness of the death penalty or aggravating factors that are balanced against mitigating factors?
A. I really  I'm a little hesitant to respond to that simply because I've been asked to give an opinion regarding the psychological function of this man, and I feel like what you're asking is for me to do the jury's job here. Okay. And I don't feel like I should do  I am able or should do the jury's job. I feel that in this case this individual has some psychological difficulties which could respond to intervention, segregation, if you like, and that is my basic point, not whether this is a person who is of indisputable character or anything like that. I'm simply trying to testify within my area of expertise.
It is obvious from Dr. O'Brien's answers that no prejudice resulted to the appellant from the questions and answers. In fact, it is apparent that the answers hurt the State and helped the appellant.
We note that no objection was made to the questions and, therefore, the point is procedurally barred. See Cole v. State, 525 So.2d 365 (Miss. 1987), cert. denied, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1989).
The assignment is rejected.

XX. THE ADMISSION OF INHERENTLY UNRELIABLE EVIDENCE AT THE PENALTY PHASE RENDERED THE RESULTING DEATH SENTENCE IMPERMISSIBLY RELIABLE
Dr. Carlton Stanley, a board certified forensic psychologist, was called on behalf of the State in rebuttal to the testimony introduced by Dr. Gerald O'Brien, a clinical psychologist, called by the defense. Appellant objected on the basis of the violation of the sequestration rule due to the fact that Dr. Stanley was present in the courtroom during two proffers of testimony. That ruling of the court did not constitute reversible error. Bullock v. State, 391 So.2d 601, 607 (Miss. 1980), cert. denied, 452 U.S. 931, 101 S.Ct. 3068, 69 L.Ed.2d 432 (1981).
*673 Second, the appellant objected to the testimony of Dr. Stanley on the ground that he was not properly qualified in the field of forensic psychology. After questioning Dr. Stanley, the trial judge found that he was well qualified as a forensic psychologist and overruled the defense objection. Third, there were several objections made by the appellant because of leading questions. The trial judge corrected that situation. Fourth, during redirect examination of Dr. Stanley, appellant objected to Dr. Stanley's answering questions as to appellant's ability to control himself in the courtroom and not in the grocery store where the crime occurred. That objection was overruled by the trial court. The appellant then objected (fifth) to the question of whether appellant's behavior was something he was unable to control or unwilling to control. The objection was overruled by the trial judge. No further objections were made during the testimony of Dr. Stanley.
The trial judge sent the jury to lunch and he and the attorneys remained to consider selection of jury instructions. After the selection of those instructions, and only then, the appellant moved to strike the testimony of Dr. Stanley basing his objection on the claim that the testimony was irrelevant, unconstitutional, violated Rule 403 and that it was prejudicial. The trial court overruled the motion. In Baker v. State, 327 So.2d 288 (Miss. 1976), the Court said:
An objection to the testimony of a witness, conduct of opposing counsel or a remark of the court should be made contemporaneously with the occurrence or matter complained of so that the court may, when possible, correct the error with proper instructions to the jury.
327 So.2d at 292. See also Brooks v. State, 242 So.2d 865 (Miss. 1971), and Oates v. State, 421 So.2d 1025 (Miss. 1982).
There being no contemporaneous objection to Dr. Stanley's testifying, the point was not preserved and was waived. Although, as stated, the issue raised here was waived in the trial below, it appears that Dr. Stanley was called to the stand to rebut the testimony of Dr. O'Brien about the type of personality disorder appellant had. It was probable that such specialized knowledge of Dr. Stanley would likely assist the jury in understanding the evidence as it related to appellant's psychological makeup. We are of the opinion that the testimony was proper under Rule 702, Miss.Rules of Evid. Dr. Stanley had researched Dr. O'Brien's reports and had been able to watch the appellant while he was on the witness stand. These factors of observation, test data, and other doctors' opinions are the types of information that professionals in the field of psychology regularly use to form opinions, which are given in court.
Dr. Stanley was called in rebuttal only after the appellants placed their own psychologist, Dr. O'Brien, on the witness stand. What happened here is that the prosecution simply used psychological evidence with which to rebut psychological evidence.
The assignment is rejected.

PART THREE: REVERSIBLE ERROR
PRATHER, Justice, for the Court:

XXI. THE PRECLUSION OF EVIDENCE OF APPELLANT'S HABITUAL-OFFENDER STATUS AND THE LOWER COURT'S REFUSAL TO INSTRUCT THE JURY THAT APPELLANT WOULD NEVER BE ELIGIBLE FOR PAROLE WAS REVERSIBLE ERROR
This Court's principal concern in capital-murder cases has been with the substance which is presented a jury as a basis for imposing a life or death sentence. In this section of the case sub judice, the concern is with the procedure by which a sentence is imposed.
The concern stems from Turner's petition through which he asks the Court to reconsider its majority opinion regarding "assigned error No. 10." No. 10 asks whether the trial judge erred when he refused to give the following instruction:

*674 Kevin Turner has been indicted as an habitual offender. If given a life sentence, Kevin Turner shall never be eligible for parole because he will be an habitual offender.
The majority concluded that the trial judge did not err. For the following reasons, this Court now holds that the jury should have been informed of Turner's ineligibility for parole.[6] This conclusion is based, for the most part, upon constitutional principles of due process and fundamental fairness. These principles have been intrinsic themes in numerous decisions of the United States Supreme Court.
For example, in one case, the Supreme Court deemed as "wise" Georgia's choice "not to impose unnecessary restrictions on the evidence that can be offered at [sentencing] hearing[s] and to approve open and far-ranging argument." Gregg v. Georgia, 428 U.S. 153, 203, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859, 891 (1976) (citing Brown v. State, 235 Ga. 644, 220 S.E.2d 922 (1975)) (emphasis added). The Court added: "We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision." Id. at 204, 96 S.Ct. at 2939, 49 L.Ed.2d at 891-92 (emphasis added). Almost immediately after Gregg was decided, the Supreme Court emphasized that it is "essential that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." Jurek v. Texas, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929, 941 (1976) (emphasis added). In another case, the Court reiterated that under the Eighth Amendment, the "qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." California v. Ramos, 463 U.S. 992, 998-99, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171, 1178-79 (1983), quoted in Caldwell v. Mississippi, 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231, 239 (1985). And more recently, the Court held that the federal Constitution "limits" states' "ability" to "narrow" a jury's consideration of any relevant evidence that could "cause it to decline to impose the death sentence." McClesky v. Kemp, 481 U.S. 279, 304, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262, 286 (1987) (emphasis in original).
Notably, nearly thirty years ago, a prophetic proposal by the American Law Institute provided: (1) that besides aggravating and mitigating factors, the sentencing jury "shall take into account... any other factors that it deems relevant," and (2) that the jury shall be informed "of the nature of the sentence of imprisonment that may be imposed, including its implication with respect to possible release upon parole, if the jury verdict is against the sentence of death." See ALI MODEL PENAL CODE § 210.6 (Prop.Off.Draft 1962) (emphasis added), quoted in Ramos, 463 U.S. at 1009 n. 23, 103 S.Ct. at 3458 n. 23, 77 L.Ed.2d at 1186 n. 23; State v. Henderson, 109 N.M. 655, 789 P.2d 603, 606-07 (1990) ("The requested instruction would have given the jury accurate information on what a life sentence actually means and would have served to correct misimpressions in some jurors' minds that a life sentence means `five or six' years or some other erroneously conceived period of time.").
In capital-murder cases like the one sub judice, the jury generally is instructed that its options are to impose sentences of life or death. Juries are often not informed that "life" means, or could mean, "life without parole." This is the consequence of trial judges exercising their power of discretion and deciding to conduct the sentencing phase prior to the phase during which the defendant's habitual-offender status is determined. When the sentencing phase is conducted first, the State argues that information regarding the defendant's eligibility for parole should be withheld from the jury because it is "totally speculative at the time of sentencing." This Court concurs with the State's argument to the extent that evidence which is "totally speculative" should be withheld from a jury deliberating the fate of a convicted defendant. *675 See, e.g., Mhoon v. State, 464 So.2d 77, 83 (1985). Thus, this opinion should not be construed as modifying or re-writing substantive case law.
Substantive matters aside, no rationale has been offered to explain why procedurally the sentencing phase should be conducted first or why the judge should be empowered with discretion to decide the order in which post-conviction phases will be conducted. See MISS.UNIF.CRIM.R. CIR.CT.PRAC. 6.04 (as amended 1982) (delineating post-conviction procedure: "If the defendant is convicted ... on the principal charge, a hearing ... without the jury will then be conducted on the previous convictions."); MISS.CODE.ANN. § 99-19-101 (1990) (delineating the procedure for the sentencing phase of a capital-murder trial).
This Court simply cannot accept as logical or justifiable the procedure by which many, if not most or all, capital-murder trials have thus far been conducted. The procedure as it stands leaves a defendant's eligibility for parole uncertain and "narrows" a jury's consideration of clearly relevant information that could "cause it to decline to impose the death sentence." McClesky, 481 U.S. at 304, 107 S.Ct. at 1773, 95 L.Ed.2d at 286 (emphasis omitted). Such uncertainty (or "total speculativeness") would be eliminated[7]without undue inconvenience[8]if the hearing on the status phase was conducted prior to the sentencing phase of the trial. Such simple yet compelling logic is not difficult to comprehend.
Accordingly, this Court directs that in future cases the status phase must be conducted prior to the sentencing phase. At the sentencing phase, the jury shall be entitled to know by instruction whether the defendant is eligible for parole. See Ex parte Rutledge, 482 So.2d 1262, 1264 (Ala. 1984) (jurors informed: (1) that they may consider death or life without parole, and (2) "that life without parole mean[s] life without parole"); State v. Willie, 410 So.2d 1019, 1033 (La. 1982) (jury instructed that "[t]he sentence will be life imprisonment without parole, probation or suspension of sentence"). Providing juries with such non -speculative information would be compliant with the dictates of logic and constitutional principles of due process and fundamental fairness. In other words, the procedure would meet the "essential" requirement that juries have before them "all possible relevant information about the individual defendant whose fate it must determine." Jurek, 428 U.S. at 276, 96 S.Ct. at 2958, 49 L.Ed.2d at 941 (emphasis added).
In sum, Turner's guilt of capital murder and status as an habitual offender is affirmed, but his death sentence is vacated. The case is remanded for re-sentencing with instructions consistent with this opinion.
SENTENCE OF DEATH VACATED; AND CASE REMANDED FOR A NEW SENTENCING TRIAL.
DAN M. LEE, P.J., and ROBERTSON, SULLIVAN and BLASS, JJ., concur.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PITTMAN, J., dissent.
ANDERSON, J., not participating.

PART FOUR: RECUSAL

XXII: JUSTICE PITTMAN'S PARTICIPATION IS QUESTIONED

A.
In his petition for a rehearing, Turner requested that Associate Justice Edwin L. *676 Pittman "consider disqualifying himself from this appeal." Turner cites various facts which prompted his request:
On August 20, 1986, the State of Mississippi submitted an extradition agreement to the Governor of Illinois, in order to return Mr. Turner to this state for trial on these charges  a process which involved the Office of Attorney General in Mr. Turner's prosecution for the first time... . Subsequently, at least as early as May 1987 the District Attorney in this case consulted with the Attorney General in furtherance of Mr. Turner's prosecution... . Finally, Mr. Turner's appeal had been docketed, and the Attorney General had become a party, prior to Justice Pittman leaving that office in January 1988.
See Appellant's Brief for Petition for Rehearing at 2; see also id. at 2-9 (citing such authorities as the federal constitution, case law, and the Mississippi Code of Judicial Conduct). This Court has considered Turner's request and concludes that it is untenable. Justice Pittman need not recuse himself in this case and, thus, the request is denied.

B.
The United States Supreme Court has recognized that not "`[a]ll questions of judicial qualification ... involve [federal] constitutional validity... . [M]atters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion.'" Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 820, 106 S.Ct. 1580, 1584, 89 L.Ed.2d 823, 831 (1986) (quoting Tumey v. Ohio, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749, 754 (1927)). Thus, "`most matters relating to judicial disqualification [do] not rise to a [federal] constitutional level.'" Aetna Life Ins. Co., 475 U.S. at 820, 106 S.Ct. at 1584, 89 L.Ed.2d at 832 (quoting Federal Trade Comm'n v. Cement Institute, 333 U.S. 683, 702, 68 S.Ct. 793, 804, 92 L.Ed. 1010, 1035 (1948)). In view of the facts of the case sub judice, this Court concludes that the issue of Justice Pittman's qualification does not rise to a federal constitutional level; therefore, perusal of relevant state law and regulations is in order. See Patterson v. New York, 432 U.S. 197, 201-02, 97 S.Ct. 2319, 2322-23, 53 L.Ed.2d 281, 286-87 (1977) ("[I]t is normally `within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion,' and its decision in this regard is not subject to proscription under the Due Process Clause `unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" (citations omitted)), quoted in Aetna Life Ins. Co., 475 U.S. at 821, 106 S.Ct. at 1585, 89 L.Ed.2d at 832.
The Mississippi Constitution provides, in part, that "[n]o judge of any court shall preside on the trial of any cause, where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same." MISS. CONST. art. 6, § 165 (1890). Case law construing this provision yields no specific enlightenment regarding Justice Pittman's qualification. This provision, however, was recently construed in conjunction with Mississippi Code Annotated § 9-1-11 (1972) and Canons 3(C)(1)(a) and (b) of the Mississippi Code of Judicial Conduct. Section 9-1-11 provides that a "judge of a court shall not preside ... where[] he may have been of counsel."[9] Canons 3(C)(1)(a) and (b) provide that:

*677 (1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding:
(b) he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;
The commentary to this Canon explains that:
A lawyer in a governmental agency does not necessarily have an association with other lawyers employed by that agency within the meaning of this subsection; a judge formerly employed by a governmental agency, however, should disqualify himself in a proceeding if his impartiality might reasonably be questioned because of such association.
(c) he knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
(d) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
(i) is a party to the proceeding, or an officer, director, or trustee of a party;
(II) is acting as a lawyer in the proceeding.
This Court construed § 165 of the state constitution, § 9-1-11 of the Mississippi Code Annotated, and Canons 3(C)(1)(a) and (b) of the Code of Judicial Conduct as not requiring a chancellor's recusal in a case involving a party whom he had twice represented during his tenure as county attorney. Rutland v. Pridgen, 493 So.2d 952 (Miss. 1986); see also Rufin v. State, 481 So.2d 312, 317 (1984) ("When a judge is not disqualified under § 165 ... or § 9-1-11, the propriety of his or her sitting is a question to review only in case of manifest abuse of discretion.").
Because Canon 3 as well as the appended commentary wholly derive from the American Bar Association's Model Code of Judicial Conduct (ABA Code), consideration of the testimony of Professor E. Wayne Thode, reporter for the ABA Committee which adopted the ABA Code, would shed further enlightenment:
[Canon 3] clarifies the status of the judge who was formerly a lawyer in a governmental agency. An agency, for example, the Justice Department, is not fully equated with a private law firm, in that a former agency lawyer is not considered to have been associated with all other lawyers in the agency. I might say we started out by equating the two and, as we went along the committee decided that that really was taking too hard a line because to say that all lawyers in the Justice Department or the FCC or any other agency are to be considered in the same way that you would consider the lawyers in a private law firm, that was too sweeping a disqualification and there was no good reason for it... .
Hearings on S. 1064 Before the Subcomm. on Improvements in Judicial Machinery of the Comm. on the Judiciary, 93d Cong., 1st Sess. 100 (1971-73); see also Aetna Life Ins. Co., 475 U.S. at 820, 106 S.Ct. at 1585, 89 L.Ed.2d at 832 (holding that the conditions delineated in Canon 3(C)(1)(a) "alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause"). Professor Thode added that a judge who had served in a governmental agency is disqualified under the ABA Code if he or she had "served as lawyer" in "the same or a similar proceeding." Muench v. Israel, 524 F. Supp. 1115, 1118 (E.D.Wis. 1981). In short, a judge is disqualified if his or her "prior contact with a case has been more than simply administrative." Id. This principle is supported by commentators who have "repeatedly recognized the absurdity of mandating recusal simply because *678 a judge has had a strictly formal relationship with a case while serving in a governmental position as Attorney General." Id. For example, Professor John P. Frank observed that "there is no impropriety where the judge's role as prosecutor has been largely formal, as in the case of Attorneys General, who have only theoretical responsibility for minor cases in their departments." Frank, Disqualification of Judges, 56 YALE L.J. 605, 624 (1947), cited with approval in Laird v. Tatum, 409 U.S. 824, 829, 93 S.Ct. 7, 10, 34 L.Ed.2d 50, 55 (1972), and quoted in Muench, 524 F. Supp. at 1118; see also Frank, Disqualification of Judges; In Support of the Bayh Bill, 35 LAW & CONTEMP.PROB. 43 (1970).
Indeed, "history is replete with examples of United States Supreme Court justices who had previously served in the Justice Department and later declined recusal in cases which had been handled by the Department during their tenure as government attorneys but with which their connections were purely formal." Muench, 524 F. Supp. at 1118 & n. 6 (footnoting several examples). Thus, "the standard for recusal followed by most Supreme Court justices who had previously served as United States Attorney General was whether their involvement in a case involved more than a mere pro forma relationship." Id. at 1118; see, e.g., Lampkins v. Gagnon, 539 F. Supp. 359 (E.D.Wis. 1982) (petitioner's motion to disqualify judge was denied  notwithstanding that, while serving as attorney general, judge's name appeared on brief as counsel for the State in petitioner's appeal to the supreme court  since judge's function was merely "pro forma" and, thus, he had no actual participation in, or knowledge of, the prior appeal). This standard has also been followed by state judges sitting in other jurisdictions. See, e.g., People v. Delongchamps, 103 Mich. App. 151, 302 N.W.2d 626 (1981) (a judge, formerly a prosecutor, was deemed qualified because he did not personally participate in the prior proceeding and because Canon 3(C) requires disqualification only if a judge "cannot impartially hear a case"); Payne v. State, 48 Ala.App. 401, 265 So.2d 185 (1972), cert. denied, 288 Ala. 748, 265 So.2d 192, cert. denied, 409 U.S. 1079, 93 S.Ct. 703, 34 L.Ed.2d 669 (holding a prosecutorial office, as distinguished from actually working on a "concrete piece of litigation," does not in and of itself disqualify an individual who subsequently becomes a judge); see also Zitter, Prior Representation or Activity as Prosecuting as Disqualifying Judge From Sitting or Acting in Criminal Case, 16 A.L.R. 4th 550, 554 (1982) (Some courts have concluded that a judge, who had been a district attorney or an attorney general in a mere supervisory or administrative capacity at the time that a defendant was prosecuted for an offense, should not be disqualified; these courts often rationalize that disqualification on mere technical grounds "would hamper the smooth operation of the judicial administration."); W. BLACKSTONE, COMMENTARIES 361 (19__) ("[T]he law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea."); Williams v. State, 383 So.2d 547 (1979) ("It is presumed that a judge is qualified and unbiased [and [t]he defendant alleging [otherwise] has a substantial burden to show the grounds therefor."), aff'd, 383 So.2d 564 (1980), cert. denied, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293. Indeed, this Court presumes that a judge, sworn to administer impartial justice, is qualified and unbiased. To overcome the presumption, the evidence must produce a "reasonable doubt" (about the validity of the presumption); that is, one must question whether "a reasonable person, knowing all of the circumstances, would harbor doubts about the [judge's] impartiality." Rutland 493 So.2d at 954.

C.
In the case sub judice, the evidence fails to overcome the presumption that Justice Pittman is qualified and unbiased. During his tenure as Attorney General, Justice Pittman's had no personal involvement in, and actual knowledge of, Turner's case while in office. Such lack of involvement or knowledge is not surprising *679 in view of the role of the Attorney General in the State of Mississippi as well as the timing of the appeal. See, e.g., MISS. CODE ANN. § 7-5-1 (1972). Indeed, the Office of Attorney General exercised no responsibility in the trial of Turner. The Attorney General's entrance into the case arose after being noticed by the filing of Turner's appeal  which occurred with only one week remaining in the term of Justice (then-Attorney General) Pittman. And the Attorney General did not file anything during this remaining week.
Moreover, the involvement of the Office of Attorney General in the actual extradition of Turner was minimal. Turner even concedes that his "extradition [from Illinois to stand trial in Mississippi was] a matter for the Executive Branch [and that it is simply] the policy of the Governor's Office to submit any extradition agreement to the Office of Attorney General for [mere administrative] review." Appellant's Brief for Petition for Rehearing at 2 n. 2.
And the record is devoid of evidence which unequivocally shows involvement in the actual prosecution of Turner. See generally MISS. CODE ANN. § 7-5-35 (1972) (The Office of Attorney General assists in the actual prosecution of cases upon "request of the governor or other state officer" including "any district attorney."); see also Dunn Constr. Co. v. Craig, 191 Miss. 682, 2 So.2d 166, 3 So.2d 834 (1941).
Finally, Turner's appeal of the circuit court judgment was not actually filed with this Court until only a week prior to Justice Pittman's departure from the Office of Attorney General. Id. at 2 n. 4.

D.
In sum, this Court concludes that Justice Pittman's participation is not barred by the federal or state constitution, statute, case law, regulation, or otherwise. Therefore, Turner's request is hereby denied.
REQUEST FOR RECUSAL DENIED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, PITTMAN and BLASS, JJ., concur.
ANDERSON, J., not participating.

MANDATE FOR PETITION ON REHEARING
PETITION FOR REHEARING DENIED AS TO GUILT AND HABITUAL-OFFENDER STATUS.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and BLASS, JJ., concur.
ANDERSON, J., not participating.
PETITION FOR REHEARING GRANTED AS TO SENTENCE OF DEATH AND CASE REMANDED FOR A NEW SENTENCING TRIAL.
DAN M. LEE, P.J., and ROBERTSON, SULLIVAN and BLASS, JJ., concur.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PITTMAN, J., dissent.
ANDERSON, J., not participating.
REQUEST FOR RECUSAL DENIED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, PITTMAN and BLASS, JJ., concur.
ANDERSON, J., not participating.
ORIGINAL OPINION WITHDRAWN AND THIS OPINION SUBSTITUTED THEREFOR.

ON PETITION FOR REHEARING
ROY NOBLE LEE, Chief Justice, dissenting as to part III:
I do not agree that the lower court erred in its refusal to grant an instruction that appellant was an habitual offender and would never be eligible for parole. Therefore, I dissent from the actions of the majority, on the petition for rehearing, to so hold and grant the petition.
The issue presented to this Court on direct appeal, and rejected, arises by refusal *680 in the lower court of the following instruction:
Kevin Turner has been indicted as an habitual offender. If given a life sentence, Kevin Turner shall never be eligible for parole because he will be an habitual offender.
This Court has consistently held that the State may not introduce evidence or comment upon the fact that a person convicted of capital murder and sentenced to life in prison will be eligible for parole in ten (10) years. The same shoe must be worn by the appellant. The same law must apply to the defendant/appellant as to the State/prosecution. Both are entitled to a fair trial under the same rules and procedures. This Court has consistently rejected such a jury instruction and arguments on the question. In Mhoon v. State, 464 So.2d 77 (Miss. 1985), the same question was before the Court and we held:[1]
Whether Mhoon would ultimately be sentenced as a recidivist was a matter legally just as speculative as whether he might someday be paroled. We forbade argument about possible parole in Williams v. State, 445 So.2d 798, 812-13 (Miss. 1984). We hold here that the trial judge correctly prohibited defense counsel from presenting testimony speculatively as to whether Mhoon would be sentenced as a recidivist to life without parole.
464 So.2d at 83.
In the case sub judice, appellant was indicted as an habitual offender, as stated, but the hearing on the habitual offender part of the indictment would be considered and addressed by the court after the bifurcated trial involving the guilt phase and sentence phase. Appellant was in the same posture as in the Mhoon case.
In Williams v. State, 445 So.2d 798, 812-13, cert. den. 469 U.S. 1117, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985), the Court said:
A jury should have no concern with the quantum of punishment because it subverts a proper determination of the sentencing issue.
445 So.2d at 813. King v. Lynaugh, 850 F.2d 1055 (5th Cir.1988), supports Williams v. State, supra, holding that there is no constitutional right to inform the jury of the possibility of parole in a capital case. King also disposes of appellant's claim that he should have been allowed to voir dire the members of the jury on their understanding of Mississippi parole laws. There is no constitutional right to voir dire on the understanding of parole.
The record reflects that counsel for appellant stated to the jury panel on voir dire that appellant would never be paroled, if given life imprisonment. In closing argument, both counsel for appellant argued specifically and at length, without objection from the State, that, if given life imprisonment, appellant would spend the rest of his life at the Mississippi State Penitentiary. An example of that argument follows:
BY MR. WELCH: May it please the Court. Good afternoon. Stood [sic] up here with you yesterday. Tried to tell you then that if you find Kevin guilty of anything, anything at all, he'd spend the rest of his natural life in prison. I told you yesterday that, in my opinion, it wasn't capital murder. I tell you today it's still not capital murder. But I have to tell you this now also. It's not. If you sentence Kevin to life, he'll spend every moment of every day of the rest of his natural life at Parchman. I promise you that.
* * * * * *
BY MR. WELCH: Because if you come out with life, Kevin Turner will spend every moment of every minute of every hour of every day of the rest of his life at Parchman. Justice demands life from this case. Thank you.
As part of the sentencing instruction S-4, the jury received the following charge:
You may consider the following examples in mitigation  those which tend to warrant the less severe penalty, life imprisonment  in determining whether the death sentence should be imposed;
* * * * * *

*681 (4) Any other matter or any other circumstance of the defendant's character or record, and any other circumstance of the offense brought to you during the trial of this cause which you, the Jury, deem to be mitigating on behalf of the defendant.
The lower court, in being more than fair to the appellant, went beyond the law and granted the following instructions at the request of the appellant:
D-II-17
Regardless of the balance of aggravating and mitigating circumstances, you may afford Kevin Turner mercy in this proceeding.
D-II-18
The Court instructs the Jury that you need not find any mitigating circumstances in order to return a sentence of life imprisonment.
D-II-20
The Court instructs you that mitigating circumstances are those which do not constitute a justification or excuse for the offense in question but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability of blame.
The lower court followed the law stated long ago, and recently, in granting and refusing instructions in the present case. Now in one swoop the majority is overruling established cases, destroying procedure and policy and nullifying the jury's verdict in this serious, but well tried and fully instructed, death penalty case. The law forbid!
After this reversal, an astute district attorney should never charge an habitual offender, as such, in the trial of a capital murder case, which the jury may decide deserves the death penalty. On the contrary, if a verdict less than death is returned, other procedures will be available.
I dissent from the majority opinion vacating the death penalty and remanding for a new sentencing hearing.
HAWKINS, P.J., and PITTMAN, J., join this opinion.
ANDERSON, J., not participating.
NOTES
[1] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The appellant Kevin Lewis Turner and the victim Elizabeth Blakely are both black. He cites Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), in support of his argument that the selection of jury foremen in Pike County is discriminatory, basing his argument on the fact that in the past twenty grand jury terms, there have been only two (2) black and four (4) women grand jury foremen appointed and that such establishes a pattern of discrimination for quashing the indictment.
[4] See McNeal v. State, 551 So.2d 151 (Miss. 1989) [not yet reported]. See also dissenting opinion of Chief Justice Roy Noble Lee, setting out the number of cases which this Court has affirmed on the question during the past fifteen (15) years.
[5] Edward Earl Johnson was convicted of capital murder and was executed May 20, 1987.
[6] Mississippi's habitual-offender statute actually provides that the offender's sentence "shall not be reduced or suspended nor shall such person be eligible for parole or probation." MISS. CODE ANN. § 99-19-83 (1990 Supp.).
[7] The State argues that many cases, which involve an habitual offender sentenced to life without possibility of parole, inhere an element of speculativeness since the offender could successfully challenge a prior felony. See, e.g., Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). In addition, the governor could grant a reprieve or pardon. See MISS. CONST. art. 5, § 123. The chance that any of these events could occur, however, are infinitesimal.
[8] During oral argument before this court, the prosecuting district attorney conceded that establishment of Turner's habitual-offender status prior to the sentencing phase would not have resulted in undue inconvenience. Indeed, this court's review of transcripts of the numerous cases involving an habitual offender has revealed that the status phase consumes an average of thirty minutes.
[9] This Court construes the phrase  "of counsel"  as having a plain and ordinary meaning; that is, "of counsel" refers to one who actually participated in the prosecution or defense of the case in controversy. Accord People v. Burnett, 73 Ill. App.3d 750, 29 Ill.Dec. 678, 392 N.E.2d 235, 238 (1979) ("We conclude that the words ... referring to a judge who `acted as counsel' should be given their plain meaning, and should apply to a judge who was actually involved in the prosecution or defense of an accused's case."); see Kirby v. State, 78 Miss. 175, 179, 28 So. 846, 846 (1900) ("Because one may be the general counsel for the state or a private person cannot disqualify him from presiding in a case in which he was not actually of counsel, did not advise, and was ignorant of the facts." (emphasis added)) (interpreting Miss. Code Ann. § 919 (1892), which provided in part that the "judge of a court shall not preside ... where[] he may have been of counsel").
[1] Authored by Justice Prather, now writing to grant the petition in the present case.