# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-CA-00283-SCT

*BOBBY BATISTE a/k/a BOBBY L. BATISTE a/k/a*
*BOBBY L. BATISTE, JR. a/k/a BOBBY LIONEL*
*BATISTE, JR. a/k/a BOBBY LIONEL BATISTE*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 12/18/2018 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | BENJAMIN H. McGEE, III |
| | LOUWLYNN VANZETTA WILLIAMS |
| | JASON L. DAVIS |
| | BRAD A. SMITH |
| | DELLWYN K. SMITH |
| | CAMERON LEIGH BENTON |
| | CAROL RENE' CAMP |
| | LADONNA C. HOLLAND |
| | SCOTT A. C. JOHNSON |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION |
| | COUNSEL BY: |
| | BENJAMIN H. McGEE, III |
| | TREASURE R. TYSON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| | BRAD A. SMITH |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | AFFIRMED - 03/03/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1. Bobby Batiste was convicted of capital murder in Oktibbeha County and was sentenced to death. His conviction and sentence were affirmed by this Court. *Batiste v. State*, 121 So. 3d 808 (Miss. 2013) (*Batiste I*). We later granted Batiste the right to file a petition for post-conviction relief (PCR) in *Batiste v. State*, 184 So. 3d 290 (Miss. 2016) (*Batiste II*), because we determined that he was entitled to a hearing regarding alleged communications between bailiffs and/or others and members of the jury.[1]

¶2. During the hearings on Batiste's PCR petition, a motion requesting the recusal of the trial judge was made, arguing that Judge Kitchens's own memory of an alleged conversation with a juror could be relied on in witness-credibility determinations while evaluating the merits underlying the PCR petition. This motion was denied and, ultimately, the PCR petition was denied. Batiste appealed both the denial of the motion to recuse as well as the denial of the PCR petition on the merits. In September 2020, having found that evidentiary questions remained relating to the recusal issue, this Court declined to address the merits of the PCR petition and remanded the case. *Batiste v. State*, No. 2019-CA-00283-SCT, 2020 WL 5739323, at *1 (Miss. Sept. 24, 2020) (*Batiste III*).

¶3. On November 20, 2020, the circuit court held a hearing pursuant to our directions for remand in *Batiste III* "for the limited purpose of allowing the trial judge to hear such

---

[1] The information in the affidavits on which the claims for relief were made was obtained in violation of the requirements of *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407 (Miss. 1993), and its progeny. It does not appear that this Court had been made aware of these violations when it handed down *Batiste II*.

evidence as is necessary to allow him to clear up any ambiguity and to determine if the alleged conversation did, in fact, take place 'during trial,' and, if it did, whether the conversation is alleged to have occurred on or off the record." ***Batiste III***, 2020 WL 5739323, at *3. After the November 20, 2020 hearing, the circuit court found that the alleged discussion between the court and the witness took place after the guilt and sentencing phases of Batiste's trial and that recusal was not necessary. Finding no error, we affirm the circuit court's denial of Batiste's motion to recuse and his PCR petition.

## FACTS AND PROCEDURAL HISTORY

¶4.    A lengthy recitation of the facts underlying Batiste's conviction and sentence, which were detailed in ***Batiste II***, is unnecessary here. Relevant to the Court's inquiry today is what occurred after ***Batiste II***. On April 4, 2018, the circuit court held a hearing to determine whether improper communications between bailiffs and/or other persons and the jury occurred during trial and, if so, what impact such communications may have had on Batiste's conviction and sentence. ***Batiste III***, 2020 WL 5739323, at *1.[2] During that hearing, Batiste

---

[2] In ***Batiste II***, we discussed the specific allegations in affidavits of jurors Denise Cranford and Webster Rowan:

Attached to Batiste's proposed petition are two affidavits from persons who served on the jury. The first, from juror Denise Cranford, says that "[t]he bailiffs were always very friendly and helpful to us. When we had questions, the bailiffs explained the law to us." She continued:

At the start of the trial, I and some of the other jurors were concerned that the jury was all white but one of the bailiffs explained to us that blacks and whites are different in their

3

called Cranford and Rowan to testify. ***Batiste III***, 2020 WL 5739323, at \*1. The State also called one of the bailiffs that served during the trial. ***Id.*** After the witnesses testified, the circuit court recessed the hearing and indicated that the hearing would resume on July 27, 2018. ***Id.***

¶5.     Because Batiste was not transported to the hearing by the Mississippi Department of Corrections, the circuit court held an in camera conference with the State's and Batiste's attorneys present. ***Id.*** At the conference, Judge Kitchens expressed his concerns regarding the following statement in Cranford's affidavit:

> During the year before my trial, my sister-in[-]law had been murdered in Tennessee by police. During the trial, Judge Kitchens told me that he knew about this situation and if there was anything he could do to help me with this situation, just let him know. I felt the judge was extremely nice to me and his attention made me feel more comfortable serving on the jury.

***Id.*** (alteration in original).

¶6.     Specifically with regard to Cranford's affidavit, "the trial judge advised the attorneys

> opinion about the death penalty. The bailiff said that black people will not consider the death penalty. After that explanation I was no longer concerned.
>
> Another juror, Webster Rowan, related, by affidavit, a similar experience: "[the jury] did not include any blacks, which at first bothered me. Someone, though I can't remember who exactly, explained that you have to be comfortable with the death penalty, and blacks don't feel as comfortable with it." He went on to say that, "[d]uring the penalty phase deliberations, we were initially split" and that "[a]fter much discussion and prayer over the course of most of that Saturday, we were able to arrive at our decision."

***Batiste II***, 184 So. 3d at 291 (alterations in original).

4

that Cranford's affidavit 'raised questions in his mind about the reliability of Ms. Cranford's testimony.'" *Id.* at \*2. Moreover, Judge Kitchens "indicated that he did not recall making the statement in question to Cranford but that he had seen Cranford at a campaign-related event in 2010 and might have made such a statement to her then." *Id.* In his motion to recuse, Batiste argued that the judge became a witness in the case by relying on his personal recollection in assessing Cranford's credibility. *Id.* Further, Batiste argued that the circuit court, by sua sponte raising the issue of Cranford's credibility based on her affidavit, provided the State with a new argument it never raised. *Id.* The State responded, arguing that Judge Kitchens had sufficient evidence to deny the PCR petition without the need to rely on his own recollection and, therefore, Batiste failed to overcome the presumption of Judge Kitchens's impartiality. *Id.*

¶7. The circuit court denied Batiste's motion to recuse, finding that

> At the July 27, 2018 discussion with the attorneys for both sides the court asked whether Ms. Cranford stated to the Office of Capital Post Conviction that this Court talked to her off the record during the pendency of this trial in October 2009. If Ms. Cranford made such a statement, then the Court would be obliged to recuse since the Court would be a witness to rebut such a statement. However, the Court is not obliged to recuse when the juror has made no such allegation. Cranford's affidavit taken on May 1, 2014, over four years after her jury service does not match her on-the-record interaction with the Court during the voir dire of this case. The Court pointed this out to the attorneys for Batiste at the July 27, 2018 meeting. Nothing more and nothing less.

And

> [b]ecause "there [was] no allegation . . . that this Court conferred with Mrs. Cranford off the record during the pendency of this trial and before the jury

5

reached its verdicts[,]" the trial judge denied the motion to recuse, saying, "[h]ad there been such an allegation by Mrs. Cranford, this Court would have recused itself."

*Id.* (second, third, fourth and fifth alterations in original) (emphasis omitted).

¶8.     The circuit court also addressed the merits of Batiste's PCR petition, finding that

"Cranford was not a credible witness in part because her testimony was contradicted by her

affidavit, her testimony and the trial record." *Id.* Specifically, the court found that

> Cranford and Rowan both testified at the April 4, 2018 hearing that once it became apparent that the jury was all white a couple of them expressed concern about the jury's racial composition. They discussed the belief that African-Americans were not as comfortable with the death penalty and thus, did not serve. Cranford's affidavit clearly indicates that she received the information at issue from a bailiff. Cranford's May 1, 2014 sworn affidavit did not name the bailiff from whom she allegedly received the extraneous information. Moreover, her affidavit did not list the gender or race of the bailiff. At the April 4, 2018, hearing of this matter Cranford indicated that she received the information about the differing views of the death penalty from a Black Bailiff. (Tr. 16). Rowan was not sure who made the statement about African-Americans' reluctance to consider the death penalty. In fact, he was not sure if the statement was made by a bailiff or another juror. (Tr. 44-45). Both Cranford and Rowan indicated that they never discussed the issue again during the pendency of the trial after their initial discussion.

¶9.     Further, the court found that

> Two African-American bailiffs served at the Batiste trial. They were William Cole and Dr. W.C. Johnson. William Cole died of cancer in 2017 (Exhibit "C") and the Office of Capital Defense did not interview him prior to his death. Dr. Johnson, the other African-American bailiff who worked the Batiste trial testified at the April 4, 2018 hearing in Starkville. Dr. Johnson testified that he would have had very little contact with the jurors outside of seating the potential jurors in the courtroom and opening the courtroom doors to allow them to leave for lunch. (Tr. 51-52). Moreover, Dr. Johnson who is no longer employed as a bailiff because of health problems denied having any such conversation with a juror and he testified that he did not see any other

6

bailiff or court personnel having any such conversation with a juror. (Tr. 52-53). The Court found Dr. Johnson's testimony and recollection to be credible. On the other hand, the Court notes that Cranford's recollection of the events of the trial in question are belied or contradicted by her affidavit and in some parts by her April 4, 2018 testimony. *The Court does not credit her recollection as being entirely accurate because of the years that passed between the time of her service and the time the affidavit was harvested.*

From the Court's review of the record of this trial it appears that Emily Britt was the courtroom bailiff during the trial who attended the jurors. (Trial Transcript Page 1774). Mrs. Britt was not called at the April 4, 2018 hearing because her husband had recently passed from cancer. However, the Court notes that Emily Britt is a Caucasian female and is not an African-American male.

The Court is satisfied that Cranford and Rowan were concerned about the racial composition of the jury because it was all white. Moreover, the Court is satisfied that Cranford and Rowan talked about the racial composition of the jury when the jury to try this case was placed in the box but before any instructions were given by the Court and before they received any testimony. The Court also believes that Cranford and Rowan talked about whether or not African-Americans had difficulty with assessing the death penalty. *However, the Court finds that Batiste has not shown by a preponderance of the evidence that Cranford and Rowan's discussions were precipitated by information received from a "black bailiff" as testified to by Cranford.* For that matter, Batiste has not demonstrated to the Court that the statements in question were made by sheriff department personnel or court personnel to Ms. Cranford or Mr. Rowan during the pendency of trial. This determination has been made by this Court after it has reviewed the certified trial transcript, the sworn affidavits submitted by Batiste and the April 4, 2018 hearing in which Cranford, Rowan and Johnson testified. *Accordingly, the Court does not find based upon all of the evidence before it that the jury composition matters discussed by Cranford and Rowan were provided to the jurors by any court personnel. See **Tanner v. United States**, 483 U.S. 107, 122-125, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987) (recognizing difference between internal influence on juror deliberations and external influence).*

(Footnote omitted.) (Emphasis added.)

¶10.   The circuit court then denied Batiste's motion to alter or amend the order denying the

7

motion to recuse and PCR petition. *Id.* In this order, the trial court reiterated its prior findings, noting that Batiste did not supply additional information to attempt to clear up any ambiguity despite being requested to do so and highlighting that Cranford did not testify regarding the supposed conversation at the April 4, 2018 hearing. The court further discussed *Gladney* in detail, finding that *Gladney* had been violated and that the testimony of Cranford and Rowan was improper due to the illegally obtained affidavits, leaving Batiste with no competent evidence for the court to consider in reviewing his petition.

¶11. On appeal in 2020, we remanded the case

> for the limited purpose of allowing the trial judge to hear such evidence as is necessary to allow him to clear up any ambiguity and to determine if the alleged conversation did, in fact, take place "during trial," and, if it did, whether the conversation is alleged to have occurred on or off the record.

*Batiste III*, 2020 WL 5739323, at *3. We clarified that

> If the finding is that the conversation took place "on the record," recusal is unnecessary and there is no need for further action at the trial-court level. We would need only review the trial judge's findings in his denial of Batiste's PCR on the merits. But should the finding be that the alleged conversation took place "off the record" during the time that the trial was ongoing, the trial judge would be in a position to take such steps as he previously recognized are necessary. While this matter may seem trivial to some, the trial judge himself recognized its importance and noted he would be "obliged to recuse" had the purported conversation occurred at some point off the record.

*Id.*

¶12. Pursuant to the remand order in *Batiste III*, the circuit court held two hearings, one on November 10, 2020, and one on November 20, 2020. At the hearing on November 20, 2020, Cranford discussed the conversation with Judge Kitchens referenced in her earlier

8

affidavit. Specifically, Cranford, when asked what she meant by "during trial," responded that "[s]omeone typed that up wrong or misunderstood or misconstrued it as being—it is totally wrong." When asked to elaborate on when the comment was made, Cranford testified that the statement was made "[a]fter the trial, after the sentencing" in the jury room. More specifically, Cranford provided that the statement was made after Batiste's sentence and verdict had been announced and while the jurors were waiting on the bus, presumably, to take them back to the hotel. Cranford further testified that she felt misled into thinking the investigator who obtained the affidavit worked for the Attorney General's Office.

¶13. The circuit court issued its opinion denying Batiste's motion to recuse on January 29, 2021. The court discussed the sequence of proceedings and the November 20, 2020 hearing, noting that Cranford "testified under oath that she did not talk to the Court during the trial about her sister in law's death" but, rather, "testified unequivocally that after the trial was over and while the jurors were awaiting a bus to pick them up, the Court entered the juror room and had the conversation with her she mentioned in her May 1, 2014 affidavit." Further, Cranford "was in fact adamant that she did not talk to the Court off the record during trial."

¶14. In its opinion, the court noted that "[Cranford's] affidavit submitted by Melissa Barnes Palmer of the Mississippi Office of Capital Post Conviction Counsel could be read to indicate that this Court talked to Ms. Cranford about her sister in law's death while the jurors were still hearing evidence in Batiste's case." Consequently, the court had "concerns

9

about Palmer's affidavit she prepared for Ms. Cranford because it appeared to indicate that the Court had violated both *Rushen v. Spain*, 464 U.S. 114, 104 S. Ct. 453 (1983) and *De la Beckwith v. State*, 707 So. 2d 547 (Miss. 1998)." The court also determined that "this was belied by the official record of the case." The circuit court concluded that at the November 20, 2020 hearing, Cranford "disavowed the affidavit insofar as it [implied] that the Court engaged in *ex parte* communication with her during the course of the trial." Further, Cranford "clearly testified that her conversation with the Court occurred after the jury had been excused." Finally, the court found "that Ms. Palmer's affidavit collected from Ms. Cranford was incorrect as it [implied] improper *ex parte* communication during the trial." Batiste now appeals both the circuit court's denial of his PCR petition and his motion to recuse.

## STANDARD OF REVIEW

¶15.    The Court reviews the denial of a motion to recuse for manifest abuse of discretion. *Hathcock v. S. Farm Bureau Cas. Ins. Co.*, 912 So. 2d 844, 849 (Miss. 2005). And "[a] litigant contending that a judge's failure to recuse was a manifest abuse of discretion has a heavy burden of proof." *Batiste III*, 2020 WL 5739323, at *2 (citing *Payton v. State*, 897 So. 2d 921, 943 (Miss. 2003)). Further, the litigant needs to "overcome the presumption of impartiality 'that a judge, sworn to administer impartial justice, is qualified and unbiased.'" *Id.* (quoting *Payton*, 897 So. 2d at 943). Moreover, the Court considers "[e]very act and movement had during the entire trial . . . and if we are unable to find that rulings have been

10

prejudicial to the defendant, we will not reverse." *Id.* (internal quotation marks omitted) (quoting *Payton*, 897 So. 2d at 943). If, however, "the evidence produces a reasonable doubt about the judge's impartiality, recusal is required." *Id.* (citing *Hathcock*, 912 So. 2d at 849).

¶16. Additionally, "[t]his Court's applicable standard of review when considering the denial of a petition for post-conviction collateral relief is well settled; this Court will not disturb the factual findings of a trial court in denying the petition unless such findings are clearly erroneous." *Smith v. State*, 290 So. 3d 1244, 1246 (Miss. 2020) (internal quotation marks omitted) (quoting *Rowland v. State*, 42 So. 3d 503, 506 (Miss. 2010)). And "[a] 'finding of fact' is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *U.S. Fid. & Guar. Co. v. Est. of Francis ex rel. Francis*, 825 So. 2d 38, 44 (Miss. 2002) (internal quotation marks omitted) (quoting *Perkins v. Thompson (In re Est. of Taylor)*, 609 So. 2d 390, 393 (Miss. 1992)). But questions of law are reviewed de novo. *Smith*, 290 So. 3d at 1246 (quoting *Rowland*, 42 So. 3d at 506).

¶17. Finally, "[a] trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence[,]" and "[u]nless the judge abuses his discretion so as to be prejudicial to the accused," the appellate court will not reverse such a ruling. *Gore v. State*, 37 So. 3d 1178, 1183 (Miss. 2010) (internal quotation marks omitted) (quoting *Price v. State*, 898 So. 2d 641, 653 (Miss. 2005)).

11

**DISCUSSION**

**I.      Motion to Recuse**

¶18.    Canon 3 of the Mississippi Code of Judicial Conduct governs recusal.  Specifically, Canons 3E(1)(a) and 3E(1)(d)(iv) "require a judge to disqualify himself when the judge has 'personal knowledge of disputed evidentiary facts concerning the proceeding' or if 'to the judge's knowledge [he is] likely to be a material witness in the proceeding,' respectively." ***Batiste III***, 2020 WL 5739323, at *2 (alteration in original) (quoting Miss. Code of Jud. Conduct Canons 3E(1)(a), 3E(1)(d)(iv)).  And "the Code of Judicial Conduct requires recusal only when a judge had personal knowledge of *disputed evidentiary* facts related to a case, not personal knowledge of all case-related facts." ***Patton v. State***, 109 So. 3d 66, 77-78 (Miss. 2012).  Of course, it is presumed that a judge, sworn to administer impartial justice, is qualified and unbiased. ***Wal-Mart Stores, Inc. v. Frierson***, 818 So. 2d 1135, 1141-42 (Miss. 2002).

¶19.    This Court has before examined whether "the chancellor had 'sufficient involvement' which warranted recusal[.]" ***Bardwell v. Bardwell (In re Conservatorship of Bardwell)***, 849 So. 2d 1240, 1247 (Miss. 2003).  In that case, Randy Bardwell petitioned to be appointed conservator of his stepmother's person and estate. ***Id.*** at 1241-42.  The chancellor later removed Bardwell as conservator and ordered that he repay unearned conservator fees. ***Id.*** at 1242-45.  Appealing the chancellor's order, Bardwell asserted that the chancellor should have recused after he made "the comment that 'I made some mistakes by authorizing a fee

12

that I did not have sufficient information on, and I did not look at close enough . . . And in retrospect obviously I wish I hadn't done that.'" *Id.* at 1245-46. Bardwell thus alleged "that the chancellor had become sufficiently involved in the case to warrant recusal because the chancellor confirmed the appointment of conservator, authorized him to enter into a timber management contract, authorized the payment of expenses of the conservatorship, and authorized the $27,000 conservator's fee." *Id.* at 1246.

¶20. We disagreed, finding instead that nothing suggested the chancellor should have recused. *Id.* We explained that Bardwell's argument that recusal was necessary was without merit. *Id.* at 1247. Specifically, we opined that

> If we were to declare today on the facts of this case that the chancellor had "sufficient involvement" which warranted recusal, we would be establishing a standard whereby all chancellors would have to recuse themselves from all matters tried in their courts wherein they had previously heard anything involving the case.

*Id.* Moreover,

> all the chancellor was doing once he realized a mistake was made was reacting in a manner inherently ingrained into our chancellors that they were "superior guardians" over persons under a disability, and that our chancery courts "must take all necessary steps to conserve and protect the best interest" of the wards of the court.

*Id.* at 1248 (quoting *Union Chevrolet Co. v. Arrington*, 162 Miss. 816, 138 So. 593, 595 (1932)). Therefore, we found no basis for the chancellor's recusal in *Bardwell*.

¶21. Just as in *Bardwell*, we decline to hold that Judge Kitchens's personal knowledge of the occurrence or nonoccurrence of the conversation between him and Cranford, an alleged

13

conversation all parties agree is ancillary to the merits of the case, led to his sufficient involvement such that recusal was warranted. Further, all Judge Kitchens did, when faced with a suspicious allegation, was react in a manner that provided Batiste an opportunity to get the record straight and determine what conversation, if any, occurred between Judge Kitchens and Cranford. Indeed, holding that Judge Kitchens was required to recuse for expressing his concerns about the veracity of Cranford's affidavit would imply, contrary to our concerns discussed in *Bardwell*, that judges need to recuse in all matters tried in their court when they previously heard anything involving the case that informed later proceedings involving the same parties. *See id.* at 1247.

¶22. Further, the wisdom of remanding this case for clarification in *Batiste III* is now evident. We asked the trial court to clarify whether the alleged conversation took place "during trial" and, if it did, whether the conversation was on or off the record. *Batiste III*, 2020 WL 5739323, at *3. Cranford made clear that the conversation did not take place during trial at all, thus answering our inquiry. She further made abundantly clear that she did not tell the investigator that any conversation took place during trial and, when asked what the phrase "during trial" meant, stated that "[s]omeone typed that up wrong or misunderstood or misconstrued it as being—it is totally wrong." Cranford also testified that she had felt misled into believing the investigator was from the Attorney General's Office.[3]

---

[3] This is, of course, one of the specific problems that following the procedure in *Gladney* is meant to avoid.

14

¶23.   In other words, Batiste presented an affidavit to the court containing an incorrect allegation that could be construed to indicate that the trial judge had improper contact with a juror.[4] Then, when the trial judge expressed concerns about this paragraph, which we now know to be incorrect, and asked for clarification from Cranford, Batiste, rather than attempting to help clarify the ambiguity, simply moved for recusal over the judge's recollection of the incorrect averment and the possibility his memory would be pitted against Cranford's.  Finally, on remand, after Cranford clarified that no such conversation had taken place until the trial was fully completed, Batiste audaciously argues that any conversation after the trial was over was "off the record" and, therefore, inappropriate or, at the very least, conformed to our inquiry about the conversation.  This is, of course, incorrect.

¶24.   There was never a basis for recusal based on contact with Juror Cranford: such contact did not occur until after trial had been fully completed and the jury had been discharged.  Likewise, the trial judge did not pit his memory against Cranford's as to the contact when he expressed concerns to the attorneys about a statement he did not remember making years before and suggested an additional hearing to help in clarifying the potential ambiguity.  Batiste actually argues that the judge could (and should) have kept quiet about his concerns about the paragraph and his memory on the topic and "simply ruled."  However, the trial

_____

[4] Nothing in this opinion is meant to imply that the investigator with the Office of Capital Post Conviction Counsel did anything intentional.  No evidence in that regard is before the Court.  Cranford herself acknowledged this could have been a typographical error, a misunderstanding, or a misconstruction.  Nevertheless, she was clear that it was "totally wrong."

15

judge's actions in bringing the concern to Batiste's attention gave Batiste an opportunity to clarify and/or address the issue; it was the proper course of action.

¶25.    There was never anything more than speculation that the trial judge might be a necessary witness in this case.  That speculation was unfounded and was cleared up on remand when Cranford clarified that she had never made the statement, as contained in her affidavit, regarding speaking with the trial judge during trial.  Mere speculation that a judge may be called as a witness is not a sufficient reason to require recusal.  ***Walls v. Speed***, 722 So. 2d 566, 571 (Miss. 1998) (citing ***Turner v. State***, 573 So. 2d 657, 678 (Miss. 1990)).

¶26.    Finally, the trial judge laid out his reasons in detail for finding the allegation of bailiff contact with the jury not to be credible to the exclusion of the allegation of contact between the trial judge and Cranford.  The judge's memory was not the basis for his decision regarding the credibility of Cranford's testimony as to the actual issue in controversy: whether there had been improper contact between the bailiff and the jury.  We affirm the trial judge's decision denying the motion for recusal.

## II.    Post-*Batiste II* Hearing

### A.    *Gladney* Violations

¶27.    Before determining that no bailiff made comments concerning the racial composition of the jury, the circuit court discussed the Office of Capital Post-Conviction Counsel's actions in obtaining Cranford's and Rowan's affidavits.  In doing so, the court noted that the Office of Capital Post-Conviction Counsel's contact with jurors Rowan and Cranford

16

occurred without permission from the circuit court and that no evidence suggested the Attorney General's Office was given notice of the intent to interview Rowan and Cranford.

¶28. Mississippi Rule of Evidence 606(b)(1) provides that

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

MRE 606(b)(1). Certain exceptions to this rule, however, are provided by Rule 606(b)(2):

> A juror may testify about whether: **(A)** extraneous prejudicial information was improperly brought to the jury's attention; or **(B)** an outside influence was improperly brought to bear on any juror.

MRE 606(b)(2).

¶29. In *Gladney*, the Court recognized "a 'general reluctance' to reconvene and question jurors 'for potential instances of bias, misconduct[,] or extraneous influences' after a verdict has been reached, and such inquiries should not be entertained where it is a 'mere fishing expedition.'" *Roach v. State*, 116 So. 3d 126, 131 (Miss. 2013) (alteration in original) (quoting *Gladney*, 625 So. 2d at 418). In light of this concern, the Court established a procedure for trial courts to utilize when allegations of juror misconduct or extraneous information improperly brought to the jury's attention are made. *Id.* at 132 (citing *Gladney*, 625 So. 2d at 418). First, after a party informs the trial court of potential improper influence on the jury or juror misconduct, the court must determine if an investigation is warranted. *Id.* (citing *Gladney*, 625 So. 2d at 418). "An investigation is warranted if the trial judge finds

17

that 'good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information.'" *Id.* (quoting *Gladney*, 625 So. 2d at 419). Without a "threshold showing of external influences," the inquiry ceases. *Id.* (internal quotation marks omitted) (quoting *Gladney*, 625 So. 2d at 419).

¶30. Further, "[i]f the trial judge has 'good cause to believe' there was improper influence on the jury, the court should conduct a post-trial hearing." *Id.* (quoting *Gladney*, 625 So. 2d at 419). Second, the trial court determines "whether the communication was made and the nature of the communication." *Id.* (citing *Gladney*, 625 So. 2d at 419). Should this investigation reveal that a communication was made, the trial court must then decide whether there is a reasonable possibility that the communication altered the verdict. *Id.* (citing *Gladney*, 625 So. 2d at 419).

¶31. Batiste asserts that *Gladney* is not properly applied in a PCR context and is not meant to address allegations of misconduct occurring "long ago." But *Carr v. State*, 873 So. 2d 991, 1005-07 (Miss. 2004), applied *Gladney* in a death-penalty PCR involving allegations of conduct occurring years before with facts similar to those alleged by Batiste. *Id.* Batiste also argues that *Gladney* does not apply in this case because Batiste's allegations are of "bailiff misconduct" and not "juror misconduct." However, *Carr* dealt with the exact same type of conduct, an allegation of improper contact between the bailiffs and the jurors. *Id.*[5]

---

[5] The distinction between "juror misconduct" and "bailiff misconduct" is misleading. It is all juror misconduct. Actions of misconduct by a bailiff may be subject to discipline by the trial court. The questions in a bailiff-misconduct case involving contact with the jury are

¶32.   In *Merchant v. Forest Family Practice Clinic, P.A.*, we examined whether counsel had made the trial court aware of alleged juror misconduct "as expeditiously as possible" when an affidavit disclosing alleged misconduct was taken on June 5, 2009, and counsel filed a motion notifying the court of the alleged misconduct on June 12, 2009. *Merchant v. Forest Fam. Prac. Clinic, P.A.*, 67 So. 3d 747, 753 n.9 (Miss. 2011) (quoting *Gladney*, 625 So. 2d at 418).  In that case, though the issue was not properly before the court on cross-appeal, we took the "opportunity to remind the bench and bar of the entire 'method to uniformly execute juror inquiry under [Mississippi Rule of Evidence] 606(b)' outlined in *Gladney*."  *Id.* (alteration in original) (quoting *Gladney*, 625 So. 2d at 418).  In *Roach*, building on the reminder from *Merchant*, we noted that when Roach's brother testified that a juror, Tate, first notified him of an alleged incident of juror misconduct occurred immediately following trial in 2004, counsel was informed of the misconduct between 2004 and 2006, Tate's affidavit was obtained in March 2010 and Roach's PCR petition was filed in September 2010, "the State and the circuit court were not 'made aware of the allegation as expeditiously as possible.'" *Roach*, 116 So. 3d at 132 (quoting *Gladney*, 625 So. 2d at 418).  There, we posited that "[i]t would not have been error for the trial court to dismiss the issue for failure to notify the court when evidence of the alleged misconduct manifested." *Id.*  But since the trial court in *Roach* considered the merits of the issue in light of Roach's right to an impartial

_____

whether *the juror* received extraneous information and what, if any, influence the contact might have had upon *the jury*.

19

jury, we reviewed the merits as well. *Id.* at 132-33 (citing Miss. Const. art. 3, § 26).

¶33. It is clear that the Office of Capital Post-Conviction Counsel failed, and apparently did not even attempt, to follow the appropriate method for post-verdict juror inquiry as laid out by this Court in *Gladney* and its progeny. If it had done so, it is likely we would not find ourselves in this morass, with incorrect allegations of a bailiff helping the jury understand the law and, at best, a misleading statement of contact between the trial judge and a juror. This is a textbook example as to why *Gladney* exists.

¶34. As part of it's 2019 order, the circuit court stated, in part, as follows:

> The Mississippi Office of Capital Post-Conviction Counsel never notified the Court of any evidence to support a belief that any juror in this case was subject to improper outside influence or received extraneous prejudicial information the pendency of the trial. Prior to their unlawful out of court polling of Cranford and Webster they did not make any showing as required by *Gladney*, *supra*, to seek its interviews of Cranford and Rowan. "In the absence of a threshold showing of external influences, an inquiry into the juror verdict is not required." *Gladney* at 419. Therefore, for the reasons stated above the Court finds that Batiste's interviews of Cranford and Rowan are improper and unlawfully collected and their use is prohibited in this matter. The Court finds that Cranford's and Rowan's testimony of April 4, 2018 was unlawful because Batiste used unlawfully obtained affidavits to justify the subpoenas of Cranford and Rowan. Thus, Batiste does not have any competent evidence for this Court to consider in his attempt to gain a new trial.

¶35. This Court has yet to recognize a blanket exclusion of evidence obtained in violation of *Gladney*. We do not choose to do so now. Rather, we leave such decisions to the sound discretion of the trial court. "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Gore*, 37 So. 3d at 1183

20

(internal quotation marks omitted) (quoting *Price*, 898 So. 2d at 653).

¶36. We note, as we did in *Roach*, that it is does not necessarily constitute error for the circuit court to dismiss the issue or exclude the affidavits for failure to properly notify the court when evidence of alleged misconduct manifested. That is what the circuit court did here in recognizing that it had no competent evidence before it to render a decision on Batiste's claims. We find no abuse of discretion in the trial court's holding that the use of the improper interviews is prohibited and, likewise, the testimony obtained as a result of the illegally obtained interviews is unlawful, leaving the court with no competent evidence from Batiste supporting his claims.

¶37. We take this chance to, once again, reiterate to the members of the Mississippi Bar that *Gladney* and its progeny provide the controlling procedural framework and should be followed in all cases when applicable. Practitioners proceed at their own risk if they ignore *Gladney* and its very simple and unambiguous requirements.

      B.     *Whether Batiste's Sixth Amendment right to an impartial jury was violated*.

¶38. As stated above, the trial judge was well within his discretion to exclude the affidavits and subsequent testimony under *Gladney* and find that no competent evidence supported Batiste's claim. Our analysis can end here. However, in light of the sentence facing Batiste and his right to an impartial jury and because the circuit court reached the merits of his claims, we likewise consider the merits of Batiste's Sixth Amendment claims.

¶39. The substantive claim for which we granted Batiste leave to file a PCR petition in the

21

circuit court is the allegation that Batiste's Sixth Amendment right to a fair trial and an impartial jury was violated on the basis of the conduct of the bailiffs during trial. *Batiste II*, 184 So. 3d at 291. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." *Id.* (alteration in original) (internal quotation marks omitted) (quoting U.S. Const. amend. VI); *see* Miss. Const. art. 3, § 26. Further, the Court has held that "[t]he right to a fair trial by an impartial jury is fundamental and essential to our form of government. It is a right guaranteed by both the federal and the state constitutions." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Johnson v. State*, 476 So. 2d 1195, 1209 (Miss. 1985))).

¶40.    In *Batiste II*, though in the context of whether we would allow Batiste to proceed in circuit court with his PCR petition, we discussed potential consequences for the alleged comments made by the bailiffs to the jurors. *Id.* at 293-94. We mentioned the alleged explanation of the law by the bailiffs to Cranford. *Id.* at 293. That portion of Cranford's affidavit was denied by Cranford in later sworn testimony before the circuit court.[6] What is left then is our discussion of the comments allegedly made by a bailiff to Cranford and Rowan regarding the significance of an all-white jury in a capital-murder case:

Furthermore, according to one juror, the bailiff explained that the reason no

---

[6] We note that Cranford disavowed the allegation contained in her affidavit that a bailiff had explained the law to her after our ruling in *Batiste II*. Obviously, this allegation had been a major factor in the *Batiste II* ruling. We do not know what effect, if any, this disavowal would have had on the *Batiste II* ruling and its finding regarding presumptive prejudice.

22

African Americans were serving on the jury was because "blacks and whites are different in their opinion on the death penalty" and "black people will not consider the death penalty." Another juror agreed that "someone" had "explained that you have to be comfortable with the death penalty, and blacks don't feel as comfortable with it." While such an explanation may have alleviated the concerns of the jurors regarding the absence of African Americans on Batiste's jury, we cannot say that such remarks to jurors, if made, did not impact Batiste's fundamental constitutional right to a fair trial by an impartial jury. This case seems especially egregious in light of the heightened standard which we are bound to apply in cases which involve the death penalty. As in *Wilkerson*[ *v. State*], "the record sustains the presumption that the statement made to the jury by the bailiff may have had a decided effect upon the verdict." *Wilkerson*[ *v. State*, 78 Miss. 356, 29 So. 170, 170 (1901).] As in *Parker*[ *v. Gladden*], "we believe that the unauthorized conduct of the bailiff 'involves such a probability that prejudice will result that it is deemed inherently lacking in due process.'" *Parker*[ *v. Gladden*, 385 U.S. at 365, 365, 87 S. Ct. 468, 17 L. Ed. 2d 420 (1966).] One of the jurors' affidavits indicated that, "[d]uring the penalty phase deliberations, we were initially split," so it cannot be said with certainty whether the split was resolved by the comments of the bailiffs. Based on the record before us, we find that the bailiff's conduct, if accurately reported, was presumptively prejudicial.

*Id.* (fifth alteration in original). Of course, we then determined that Batiste was entitled to a hearing before the "circuit court to ascertain what communications were had between bailiffs and/or other persons and the jury and to determine, insofar as is possible, what impact, if any, those communications had on Batiste's conviction and sentence." *Id.* at 294.

¶41.    In *Batiste II*, we looked to *Horn v. State*, 216 Miss. 439, 62 So. 2d 560 (1953), in which "[t]he bailiff was asked by the jury about the penalty for the crime of manslaughter, whereupon he responded that the penalty was service of between one year to ten years in the state penitentiary." *Batiste II*, 184 So. 3d at 293 (citing *Horn*, 62 So. 2d at 561). The jury returned its guilty verdict and requested that Horn be given the court's mercy about thirty

23

minutes later. *Id.* (citing ***Horn***, 62 So. 2d at 561). We reversed, holding that "the jurors understood from the bailiff the punishment was from one to ten years in the penitentiary. That was not correct. In the case of punishment by being sent to the penitentiary the penalty is not less than two years nor more than twenty years." *Id.* (internal quotation marks omitted) (quoting ***Horn***, 62 So. 2d at 561). We then opined that

> Conceivably, had the jurors not thought defendant could be sent to the penitentiary for as short a period as one year, they would not have convicted him—at least, it is impossible to say they were not influenced in their action by the information they had received from the bailiff.

*Id.* (internal quotation marks omitted) (quoting ***Horn***, 62 So. 2d at 561).

¶42. Here, on remand, the circuit court made the following findings:

> Under ***Gladney*** and its progeny the initial presumption is that the jury's verdict was impartially rendered. ***Roach***, [116] So. 3d at 133. The Supreme Court ordered this Court to conduct a hearing once it was presented with Cranford's and Rowan's affidavits. Cranford and Rowan both testified at the April 4, 2018 hearing that once it became apparent that the jury was all white a couple of them expressed concern about the jury's racial composition. They discussed the belief that African-Americans were not as comfortable with the death penalty and thus, did not serve. Cranford's affidavit clearly indicates that she received the information at issue from a bailiff. Cranford's May 1, 2014 sworn affidavit did not name the bailiff from whom she allegedly received the extraneous information. Moreover, her affidavit did not list the gender or race of the bailiff. At the April 4, 2018, hearing of this matter Cranford indicated that she received the information about the differing views of the death penalty from a Black Bailiff. (Tr. 16). Rowan was not sure who made the statement about African-Americans' reluctance to consider the death penalty. In fact, he was not sure if the statement was made by a bailiff or another juror. (Tr. 44-45). Both Cranford and Rowan indicated that they never discussed the issue again during the pendency of the trial after their initial discussion.

¶43. Moreover, the circuit court found that neither of the two Black bailiffs (one being

24

deceased) were able to corroborate Cranford's testimony that a Black bailiff made comments regarding the racial composition of the death penalty or any consequences of the jury's composition for death-penalty cases. The court also found Dr. Johnson's testimony and recollection credible, while noting that Cranford's recollection was "belied or contradicted by her affidavit and in some parts by her April 4, 2018 testimony." To that end, the court additionally noted that

> Ms. Cranford testified at the April 4, 2018 hearing that the Bailiffs told them "that we were not to talk about the trial when we were in the room." (April 4, 2018 transcript pg. 14). It is not credible for this Court to believe that a bailiff would tell the jurors not to talk about the case while in the jury room and then indicate to Ms. Cranford that African-Americans do not believe in Capital Murder. (April 4, 2018 Hearing transcript 12). It is not credible to believe that Ms. Cranford failed to name the black bailiff out of fear that he might face repercussions. Dr. W.C. Johnson testified and denied any improper contact with the jurors. He is now retired and not employed as a bailiff and is not subject to discipline if found to have contacted Ms. Cranford during the trial and had impermissible discussions with her.

¶44. Furthermore, the court noted that although Cranford testified that one or more Black male bailiffs tended to the jury in the courtroom, "[t]he transcript of the trial of this case shows that Emily Britt, a white female bailiff, not a black male bailiff attended the jury in the courtroom." Further, at the April 4, 2018 hearing, Cranford stated that "she '[asked a bailiff. I knew the bailiffs. They were friends]' about her concerns of the racial composition of the jury." But Cranford "did not name the bailiff who she talked with. In her May 1, 2014 statement collected by Melissa Palmer Ms. Cranford did not name the bailiff nor did she describe the bailiff's gender or race." And "[t]his statement was taken some four years and

25

six months after the Batiste trial and she did not provide sufficient identifying information of the bailiff at the time the statement was given." Moreover, "[e]ight plus years after the trial she supplied a gender and racial description of the bailiff but still did not identify the bailiff even though she stated she knew all of the bailiffs and was friends with them."

¶45. The court did find that Cranford and Rowan "were concerned about the racial composition of the jury because it was all white" and that "Cranford and Rowan talked about the racial composition of the jury" and perceived implications regarding the death penalty. However, the court, having "reviewed the certified trial transcript, the sworn affidavits submitted by Batiste and the April 4, 2018 hearing in which Cranford, Rowan and Johnson testified[,]" did "not find based upon all of the evidence before it that the jury composition matters discussed by Cranford and Rowan were provided to the jurors by any court personnel."

¶46. We cannot say that the circuit court's finding that no bailiff made the alleged statements regarding the racial make-up of the jury to Cranford and Rowan was clearly erroneous in light of the evidence relied upon in its opinion supporting that finding. Indeed, given the contradictory evidence and testimony before the circuit court, along with the court's credibility determinations regarding witnesses at the hearings, we are left with neither a definite nor firm conviction that the circuit court made a mistake. *U.S. Fid. & Guar. Co.*, 825 So. 2d at 44 (quoting *In re Taylor*, 609 So. 2d at 393). As a result, the circuit court's finding that no bailiff made the alleged comments to Cranford or Rowan during trial is

affirmed. Moreover, the circuit court did not err in its decision on the merits of Batiste's

PCR petition in light of its finding that any communication between Cranford and Rowan

about the jury's racial composition occurred only amongst themselves.

¶47. The circuit court did next determine "whether it was reasonably possible that Ms.

Cranford and Mr. Rowan's discussion altered the verdicts in this case." The circuit court

found that

> Nothing in Cranford or Rowan's affidavits or testimony indicate that they were
> relieved by the absence of African-Americans from the jury. In other words,
> nothing in their affidavits or testimony at the April 4, 2018, hearing indicated
> a race-based animus against African-Americans or the Defendant. In ***Pena-
> Rodriguez v. Colorado***, 137 S. Ct. 855, 197 L. Ed. 2d 107 (2017), the United
> States Supreme Court addressed a case of juror misconduct involving racial
> stereotypes and animus. The Court reversed the Colorado Supreme Court and
> held that the court could impeach the jury's verdict when race-based animus
> was present.

Indeed, the United States Supreme Court has held that "[n]ot every offhand comment

indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow

further judicial inquiry." *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 869, 198 L. Ed. 2d

107 (2017). Rather, there needs to "be a showing that one or more jurors made statements

exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the

jury's deliberations and resulting verdict." *Id.* To constitute such a statement, it "must tend

to show that racial animus was a significant motivating factor in the juror's vote to convict."

*Id.* And this inquiry "is a matter committed to the substantial discretion of the trial court in

light of all the circumstances, including the content and timing of the alleged statements and

the reliability of the proffered evidence." *Id.*

¶48.    In *Peña-Rodriguez*, in which the defendant was on trial for harassment, unlawful sexual contact and attempted sexual assault on a child, the following occurred:

> According to the two jurors, H.C. told the other jurors that he "believed the defendant was guilty because, in [H.C.'s] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women." The jurors reported that H.C. stated his belief that Mexican men are physically controlling of women because of their sense of entitlement, and further stated, "'I think he did it because he's Mexican and Mexican men take whatever they want.'" According to the jurors, H.C. further explained that, in his experience, "nine times out of ten Mexican men were guilty of being aggressive toward women and young girls." Finally, the jurors recounted that Juror H.C. said that he did not find petitioner's alibi witness credible because, among other things, the witness was "'an illegal.'"

*Id.* at 862 (alteration in original) (citations omitted).

¶49.    Reviewing the above-quoted passage, the circuit court opined that "[n]either Cranford nor Rowan demonstrated any such racist behavior or beliefs as demonstrated in *Pena-Rodriguez.*" Further, the court determined that no showing was made that Cranford and Rowan's concerns about the composition of the jury "and their belief that African-Americans should have been on the jury cast serious doubt on the fairness and impartiality of their deliberations and resulting verdicts." That "their discussion that you had to be willing to assess the death penalty . . . . And [that] they said that black people were not real comfortable with doing that . . . does not demonstrate an 'overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict.'" Finally, the circuit court did "not find that the extraneous concern and discussion that

28

Cranford and Rowan had after being picked but before hearing any evidence and before being instructed on the law reasonably possibly altered their verdict." We agree.

¶50. Here, since the circuit court did not clearly err by determining that the discussions of the racial composition of the jury were brought about within the jury itself, rather than from an extraneous source, we hold that Batiste failed to show that Cranford, Rowan or any other jurors made any statement exhibiting overt racial bias. *Peña-Rodriguez*, 137 S. Ct. at 869. Further, the discussions between Cranford and Rowan do not reveal any racial animus, much less any racial animus that was a significant motivating factor in returning Batiste's guilty verdict and death sentence. *Id.* Therefore, we agree with and affirm the circuit court's finding that Batiste failed to prove by a preponderance of the evidence that his Sixth Amendment right to a fair trial and impartial jury was violated. As a result, we affirm the circuit court's denial of Batiste's PCR petition on the merits.

## CONCLUSION

¶51. The circuit court did not err by denying the motion to recuse. The court further did not err by excluding the testimony of the jurors in question. Finally, because the circuit court's finding that no bailiff had communications with Cranford or Rowan during trial was not clearly erroneous, the circuit court did not err by denying Batiste's PCR petition on the merits. Therefore, we affirm.

¶52. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN**

29

**OPINION JOINED BY KING, P.J.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶53.    I respectfully dissent. I continue to adhere to the position I expressed in ***Batiste v. State***, No. 2019-CT-00283-SCT, 2020 WL 5739323 (Miss. Sept. 24, 2020) (***Batiste III***) (Kitchens, P.J., dissenting), that the recusal of the Honorable James T. Kitchens, Jr., was necessary in this case.[7] In ***Batiste v. State***, 184 So. 3d 290 (Miss. 2016) (***Batiste II***), this Court had ordered an evidentiary hearing on an allegation of juror misconduct raised by Batiste's application for leave to file a motion for post-conviction relief. After an initial hearing on the allegation of juror misconduct, Judge Kitchens, *sua sponte*, asked counsel for both parties to appear in chambers for a conference. At the conference, Judge Kitchens informed the parties that, after reviewing an affidavit of one of the witnesses, Juror Denise Cranford, the judge did not recall having had a conversation with her during trial as she had alleged.[8] Further, Judge Kitchens said that the discrepancy between Cranford's affidavit and

---

[7] Circuit Judge James T. Kitchens, Jr., and Presiding Justice James W. Kitchens of this Court are not related to each other.

[8] The relevant part of Cranford's affidavit reads as follows:

> During the year before the trial, my sister-in[-]law had been murdered in Tennessee by police. During the trial, Judge Kitchens told me that he knew about this situation and if there is anything he could do to help me with this situation, just let him know. I felt the judge was extremely nice to me and his attention made me feel comfortable serving on the jury.

(Alteration in original.)

his own memory caused him to question her credibility as a witness. Prior to Judge Kitchens's raising the matter, no party had brought up that particular portion of Cranford's affidavit. That section of the affidavit had no relevance to the juror misconduct issue.

¶54.    After the in-chambers discussion, Batiste filed a motion to recuse Judge Kitchens, arguing that the judge's reliance on his own memory of facts not reflected in the trial record would place him in the role of a witness to Cranford's credibility. Because the in-chambers conference had not been recorded, Batiste attached to the motion to recuse an affidavit of his counsel describing the what had transpired at the conference. According to that affidavit, which the State did not dispute, Judge Kitchens had informed the attorneys that Cranford's allegation about the conversation "raised questions in his mind about the reliability of Ms. Cranford's testimony." Judge Kitchens said that, although he did not recall having told Cranford during the trial to let him know if she needed help concerning her sister-in-law, he had seen her at a 2010 campaign event, and he might have said it to her at that time.

¶55.    As I discussed in *Batiste III*, the record shows that Judge Kitchens injected an issue into the case of whether Cranford accurately had recalled a conversation with him. *Batiste III*, No. 2019-CA-00283-SCT, at *11 (Kitchens, P.J., dissenting). Because Judge Kitchens did not remember having had the alleged conversation with Cranford during the trial, he questioned her credibility in general. In response to Batiste's argument that the judge's using his own recollection to assess a witness's credibility made him a witness in the case, Judge Kitchens decided that Cranford had alleged the conversation was on the record. Therefore,

31

instead of relying on his own memory of whether the conversation had occurred, he could review the trial transcript and see whether it reflected the conversation as remembered by Cranford. Because the transcript did not so reflect, Judge Kitchens decided that he did not need to recuse because he could tell from the conflict between the affidavit and the record that she was not credible. But Judge Kitchens found that, if Cranford were to have alleged that the conversation was during the proceedings but off the record, then he would be required to recuse "since the Court would be a witness to rebut such a statement."

¶56.    On review, this Court recognized that Cranford's affidavit had not averred that the conversation was on the record as Judge Kitchens had found. Instead, Cranford had alleged that it had occurred during the trial. *Id.* at *3. Trials can include both on-the-record and off-the-record proceedings. *Carr v. State*, 655 So. 2d 824, 850 (Miss. 1995). Because Judge Kitchens found that he would have recused if Cranford had alleged an off-the-record conversation, I argued that Judge Kitchens should have recused and that no further inquiry into this matter or further testimony from Cranford was required. *Batiste III*, No. 2019-CA-00283-SCT, at *12 (Kitchens, P.J., dissenting); *see* Miss. Code of Jud. Conduct Canon 3E(d)(iv) (a judge must recuse if "to the judge's knowledge [he is] likely to be a material witness in the proceeding."). Because a majority of this Court disagreed, the case was remanded for fact finding by Judge Kitchens on the question of whether Cranford's allegation was that the conversation had occurred during the trial and on the record or during the trial but off the record. *Batiste III*, No. 2019-CA-00283-SCT, at *3. The Court provided

32

specific instructions applicable to the results of that fact finding. The Court said that, "should the finding be that the alleged conversation took place 'off the record' during the time that the trial was ongoing, the trial judge would be in a position to take such steps as he has previously recognized are necessary." "[T]he trial judge himself recognized its importance and noted he would be 'obliged to recuse' had the purported conversation occurred at some point off the record." *Id.*

¶57. At the hearing on remand, Cranford testified that she and Judge Kitchens had discussed the matter of her sister-in-law after the trial in the jury room while the jurors were waiting for the bus to take them back to their hotel. In other words, Cranford alleged that the conversation was off the record but after the trial. I would hold that, because Cranford alleged that the conversation was off the record, Judge Kitchens should have recused. Judge Kitchens already had found that if Cranford's allegation was that the conversation was off the record, meaning that the trial transcript could not be utilized to determine whether she was telling the truth, then he would need to rely on his own memory to determine her truthfulness. The majority finds that Cranford's testimony that the conversation was after the trial, not during the trial, relieves Judge Kitchens of any recusal obligation. I disagree. Judge Kitchens already had made an issue out of questioning Cranford's credibility based on the fact that her memory of the conversation did not match his. Because Cranford's recollection is that she spoke with Judge Kitchens off the record, only his memory could refute or confirm her testimony. And "judges possessing personal knowledge of disputed evidentiary facts

33

concerning the proceeding . . ." must recuse. Miss. Code of Jud. Conduct, Canon 3E(d)(iv).

¶58.    Rather than focusing strictly on the issue on remand, the majority veers in a different direction altogether and casts the issue as one of a judge's allegedly having had improper contact with a juror. Maj. Op. ¶ 23. But such an allegation was not the basis for Batiste's recusal motion. The basis of Batiste's recusal motion was his allegation that Judge Kitchens, in assessing a witness's credibility, had pitted his own memory against that of the witness. Because Cranford testified that she thought the conversation had been off the record, Judge Kitchens's recollection that he did not have the alleged conversation with Cranford during the ***Batiste*** proceedings, but that he might have talked to her at a 2010 political event, came into play. The recusal analysis should end there.

¶59.    I note that the majority places great import upon Cranford's testimony that her affidavit was incorrect in averring that the conversation was "during trial." Maj. Op. ¶ 22 (internal quotation marks omitted). At the hearing on remand, Cranford testified that she had a conversation with Judge Kitchens after the verdict had been announced and when the jurors were waiting in the jury room for the bus to return them to the hotel. Cranford is a lay person and it is easy to imagine a lay person's not placing significance, at the time she executed the affidavit, on the notion that the conversation was not technically "during trial." The majority implies that PCR counsel may have drafted the affidavit in a duplicitous manner in order to create a basis for suggesting that Judge Kitchens had improper contact with a juror during the trial. That contention is belied by the record; before Judge Kitchens brought up his lack

34

of memory of talking to Cranford, Batiste never had drawn attention to that part of her affidavit. At the initial hearing on the merits of Batiste's PCR, neither Batiste nor the State questioned Cranford about the matter.

¶60.    I agree with the majority that Judge Kitchens reasonably and understandably might have inquired into the allegation in Cranford's affidavit that, during the trial, he had an *ex parte* contact with a juror. The problem is that Judge Kitchens went farther than inquiring into whether he might have had *ex parte* contact with a juror while the jury was hearing evidence in Batiste's trial. He went on to use the fact that Cranford's recollection of having talked to him was at odds with own memory as a means for assessing Cranford's general credibility as a witness in Batiste's case. As I observed in my dissent in *Batiste III*, that endeavor caused Judge Kitchens to become a witness in the case and necessitated his recusal. *Batiste III*, No. 2019-CA-00283-SCT, at \*12 (Kitchens, P.J., dissenting). The majority's likening of this case to *Bardwell v. Bardwell (In re Conservatorship of Bardwell)*, 849 So. 2d 1240, 1247 (Miss. 2003), is misplaced. *Bardwell* held that a chancellor's comment that he had made a mistake in a prior ruling in the case did not show that the chancellor had prejudged the case and did not require recusal. *Id.* But the chancellor in *Bardwell* did not possess personal knowledge of a disputed fact as Judge Kitchens did in this case. The present case is considerably more troubling, especially under this Court's heightened standard of review in death penalty cases. *Ronk v. State*, 267 So. 3d 1239, 1247 (Miss. 2019) (quoting *Crawford v. State*, 218 So. 3d 1142, 1150 (Miss. 2016)). In my view, Batiste is entitled to

35

a new evidentiary hearing before another judge.

¶61.    Finally, I turn to the majority's finding "that the Office of Capital Post-Conviction Counsel failed, and apparently did not even attempt, to follow the appropriate method for post-conviction juror inquiry" as prescribed by *Gladney v. Clarksdale Beverages Co.*, 625 So. 2d 407 (Miss. 1993). Maj. Op. ¶ 33. To be clear, a post-conviction petitioner is entitled to gather information with which to support a petition. A party seeking to investigate juror misconduct "[a]t the very minimum, . . . must [show] that there is sufficient evidence to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information." *Id.* at 419. Once such a showing is made, "[j]uror polling shall only be permitted by an attorney, outside the supervision of the court, upon written request." *Id.* "Inquiry is allowable outside the presence of the trial court, upon written request and trial court permission . . . ." *Id.*

¶62.    The majority faults the Office of Capital Post-Conviction Counsel for contacting the jurors from Batiste's trial without first seeking permission from the trial court. It goes so far as to blame the Office for creating a "morass" of "incorrect allegations of a bailiff helping the jury understand the law and, at best, a misleading statement of contact between the trial judge and a juror." Maj. Op. ¶ 33. The majority deems the allegations about a bailiff's having made inappropriate comments to jurors "incorrect." But the truth or falsity of the allegations of improper bailiff-juror contact is a matter for decision by the trial court subject to review for abuse of discretion. I would hold that Judge Kitchens should have recused and that the

36

truth or falsity of the allegations should be determined by another judge.

¶63. Further, the majority's discussion gives short shrift to the procedural history of this case. The case began when Batiste filed an application for leave to proceed in the trial court with a motion for post-conviction relief. His application had the jurors' affidavits attached. When the State responded to Batiste's motion, that was the time for it to have raised a *Gladney* violation, and it did not do so. The State's response to Batiste's post-conviction application contains one brief reference to *Gladney* along with an argument on the merits that the allegations in the affidavits did not overcome the presumption of juror impartiality. If the State had challenged the affidavits in a timely fashion, then this Court could have determined whether possible violations of *Gladney* should have been addressed in the circuit court. But the State did not raise a *Gladney* violation. In the absence of argument about *Gladney*, this Court undertook a painstaking analysis of the merits of the juror misconduct issue. We ordered "a hearing to enable the circuit court to ascertain what communications were had between bailiffs and/or other persons and the jury and to determine, insofar as is possible, what impact, if any, those communications had on Batiste's conviction and sentence." *Batiste II*, 184 So. 3d at 294. We did not contemplate an investigation into how the affidavits had been obtained because the State did not raise the issue. After we granted Batiste permission to file his motion in the trial court with directions for that court to address the merits, the time for complaints about how the affidavits had been acquired had passed.

¶64. At this point, this case has become a convoluted tangle with little relationship to the

straightforward directions this Court articulated in *Batiste II*. Had Judge Kitchens recused when it became apparent that his own memory would be a factor in his assessment of a witness's credibility, all confusion could have been obviated. I would hold that "denial of the motion to recuse was a manifest abuse of discretion that denied Batiste due process of law." *Batiste III*, No. 2019-CA-00283-SCT, at *13 (Kitchens, P.J., dissenting). Because Judge Kitchens should have recused, I would hold that his denial of post-conviction relief should be reversed and that the evidentiary hearing that this Court ordered in *Batiste II* take place before a different judge.

**KING, P.J., JOINS THIS OPINION.**